[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11430

_____

D.C. Docket No. 1:16-cv-20680-RNS

SUSAN KHOURY,

Plaintiff - Appellant,

versus

THE MIAMI-DADE COUNTY SCHOOL BOARD,
GREGORY WILLIAMS,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 7, 2021)

Before MARTIN, GRANT, and LAGOA, Circuit Judges.

MARTIN, Circuit Judge:

Susan Khoury appeals the District Court's grant of summary judgment to the Miami-Dade County School Board and Officer Gregory Williams on her 42 U.S.C. § 1983 claims. All of Ms. Khoury's claims relate to an incident involving Officer Williams—a School Board Police Officer—who characterized Khoury as being a danger to herself or others, detained her, and committed her for an involuntary mental health examination under Florida's Baker Act, Fla. Stat. § 394.463. After careful review, and with the benefit of oral argument, we reverse the District Court's order granting summary judgment to Officer Williams on Ms. Khoury's false arrest and First Amendment retaliation claims, and remand for further proceedings. We affirm the court's order granting summary judgment to the School Board.

## I. BACKGROUND

A. THE 2015 INCIDENT

Ms. Khoury lives near the Glades Middle School baseball field in Miami-Dade County, Florida. For several years, she complained to the School Board about cars she believed were parked illegally around the baseball field because the gates to the field were left open. The use of the field became a nuisance to Ms. Khoury and several of her neighbors because of the noise, lights, and problems caused by the influx of people (including an increase in burglaries). Ms. Khoury and 62 of her neighbors notified the School Board of their concerns about these

2

problems and, in response, the School Board agreed to close the gates adjacent to the neighborhood in an attempt to redirect people to use the facility's parking lot, which is farther away from the residents' homes. However, when the problems continued, Ms. Khoury began taking photos and videos of cars that she believed were illegally parked near the field so she could show the School Board that the problem had not been resolved.

On the night of January 29, 2015, Ms. Khoury began taking photographs of the open, unlocked gate and what she believed were two illegally parked cars. A parent of one of the ball players, Doris Zubilliaga, was sitting in one of the cars and thought Ms. Khoury was filming her. Ms. Khoury and Ms. Zubilliaga had a verbal confrontation, which led Zubilliaga to call the police. About 20 minutes later, Officer Williams arrived on the scene. Officer Williams is a Miami-Dade Public School police officer. The Miami-Dade Public School Police Department is a law enforcement entity separate from the Miami-Dade Police Department and has its own jurisdiction.

He spoke first with Ms. Zubilliaga, who told him that she was sitting in her car when Ms. Khoury came up to her and began taking photos of her children. She said that Ms. Khoury got combative and aggressive with her when she asked Khoury to stop filming. At this point, Ms. Zubilliaga and Officer Williams were standing across the street from Ms. Khoury, so Officer Williams crossed the street

to Khoury and asked her to come speak to him by his car.  Ms. Khoury refused because she wanted to avoid further confrontation with Ms. Zubilliaga.  She instead attempted to explain her side of the story to Officer Williams from where she was.  Officer Williams says he told Ms. Khoury the cars were not illegally parked, but she did not believe him.  Ms. Khoury disputes that she and Officer Williams had this discussion.  Officer Williams then walked away from Ms. Khoury and, as reflected in a video Khoury recorded, she asked Williams for his name.  Officer Williams did not respond.

Officer Williams headed back across the street to speak with Ms. Zubilliaga.  Ms. Zubilliaga asked him to report the incident, but Officer Williams said there was nothing he could do about Ms. Khoury filming because it was her First Amendment right to do so.  He acknowledged the filming may be annoying, but told Ms. Zubilliaga that Ms. Khoury was "not mentally well."  Other residents complained to Officer Williams about Ms. Khoury and told him that she would often take photos and videotape their children at the baseball field.  One person told Officer Williams that when the residents would ask her to stop, Ms. Khoury would "get in their face" and several residents said they were "afraid of her."

While Officer Williams was speaking to Ms. Zubilliaga for the second time, Ms. Khoury walked across the street to film the license plate on Officer Williams's police cruiser because he had not identified himself to her.  When Officer Williams

4

noticed Ms. Khoury recording him and his vehicle, he asked why she was filming him. Officer Williams then raised his arm while in close proximity to Ms. Khoury in order to block the "bright light from [Khoury's] camera" that was shining "in [his] eyes." During these developments, Ms. Khoury's phone stopped recording. Thus, the only evidence about what happened from this point until Ms. Khoury was handcuffed comes from the testimony of Khoury, Officer Williams, and Ms. Zubilliaga.

All three eyewitnesses describe different versions of what happened next. Ms. Khoury claims Officer Williams "charged" her when he saw she was recording. She says that as she took a step back to get away from him, Officer Williams grabbed her arm and twisted it behind her back. Officer Williams said he held his hand up to shield his face from the light on Ms. Khoury's phone camera and that Khoury either "reache[d]" for him or "pushed" him. Either way, according to Officer Williams's version of the events, whatever Ms. Khoury did startled him, which caused him to lose his footing, stumble, and fall, as Khoury did "a flop on the ground, just boom." According to Ms. Zubilliaga's version, Ms. Khoury pushed Officer Williams and, after Williams placed his hands on Khoury, Khoury "appeared to throw herself on the ground, which almost caused Officer Williams to stumble and trip." Ms. Khoury vehemently disputes Officer Williams's and Ms. Zubilliaga's claims that she pushed him.

5

The parties agree that at some point, Officer Williams attempted to handcuff Ms. Khoury. And sometime during the altercation, Ms. Khoury heard a popping sound in her elbow and felt pain shooting down her arm, which caused her to scream in pain. Officer Victor Agosto, an off-duty police officer of the neighboring Homestead Police Department, was at the baseball field and came over to the scene to try and help Officer Williams take Ms. Khoury into custody. Officer Agosto was not in uniform. Ms. Zubilliaga filmed the remaining events.

While on the ground, Ms. Khoury squirmed around, yelled "false arrest," and asked someone to "call Metro-Dade." In Ms. Khoury's mind, Officer Williams had gone "rogue" and was illegally arresting her, and "some strange man [came] out of nowhere" to help him. She called out for "Metro-Dade" because she believed another agency needed to step in and stop these people from "illegally touching" her.[1] In response to Ms. Khoury's statement "this is a false arrest," Officer Williams "acknowledged to her" that he was going to commit her for an involuntary mental health examination under the Baker Act. Upon gaining control over Ms. Khoury and handcuffing her, Officer Williams detained her pursuant to the Baker Act and took her to a hospital, where she received treatment for a dislocated elbow.[2] She was then transferred to Miami Behavioral Health Center

---

[1] The Miami-Dade Police Department used to be called the Metro-Dade Police Department.

[2] Ms. Khoury's dislocated elbow required surgery.

6

for a mental health examination, where, on arrival, Officer Williams stated he "thought [Ms. Khoury] was delusional." However, Miami Behavioral Health Center found that there was "no evidence of . . . psychosis." Ms. Khoury was released on January 31, 2015, which was two days after the incident with Officer Williams.

Ms. Khoury filed suit against Officer Williams and the School Board. She alleged several claims under § 1983, including claims against the School Board based on municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978), and claims against Officer Williams for false arrest, excessive force, and First Amendment retaliation.

B. PROCEDURAL HISTORY

Ms. Khoury's claim against the School Board is based on her belief that in 2012—three years before her Baker Act detention—the School Board developed an unwritten policy of improperly detaining people under the Baker Act to reduce crime statistics.[3] On August 23, 2016, Ms. Khoury served the School Board with her First Request for Production and asked for all of the Baker Act incident reports from January 1, 2008 to the present day. The School Board produced thousands of documents showing each Baker Act incident. After Ms. Khoury's counsel

---

[3] After the incident, Ms. Khoury discovered newspaper articles, published around 2012, describing the School Board's practice of directing School Board police officers to use Baker Act detentions as an alternative to arrests.

7

examined some of the incident reports, counsel realized the School Board had redacted the names, dates of birth, and contact information of the people in the reports.

Ms. Khoury filed three separate motions to compel the School Board to provide her with unredacted Baker Act reports.  The Magistrate Judge denied Ms. Khoury's first motion without prejudice pending the judge's own "review of and discovery with respect to the unredacted Baker Act Reports for adults."  Ms. Khoury narrowed the scope of her second motion and asked only for "certain" unredacted reports.  The Magistrate Judge denied Ms. Khoury's request for reports, but allowed additional discovery so Khoury could depose principals, teachers, and staff involved in the specific incidents.  After taking those depositions, Ms. Khoury moved to compel unredacted reports for a third time, arguing that she needed to "speak with the students who were Baker Acted" to determine the veracity of the version of events provided by the School Board.  The Magistrate Judge granted Ms. Khoury's motion but limited the scope of the order, noting that:

1.  Subject to their consent, Plaintiff may conduct the depositions of parents or guardians of the six students involved in the Baker Act incidents for which Plaintiff has already deposed . . . [certain witnesses] . . . . To this end, counsel for [the School Board] shall contact each such parent or guardian to inquire if they consent to be deposed in a neutral, non-partisan communication. For the parents or guardians who agree, counsel for the School Board shall forward the contact information to Plaintiff's counsel.

2. Plaintiff may conduct depositions of witnesses for ten additional Baker Act incidents that occurred prior to Plaintiff's Baker Act incident, limited to no more than two witnesses per incident.

Ms. Khoury objected to this order, arguing that the Magistrate Judge erred in (1) denying her request for "the names and contact information of all students involved in Baker Act incidents from January 2008 through 2016"; (2) limiting her to depositions "of the parents or guardians" of the six students involved in the Baker Act incidents, rather than the students themselves; and (3) requiring "counsel for the Miami-Dade County School Board to contact the parents or guardians concerning the depositions" and limiting Khoury's counsel's ability to do so. The District Court affirmed the Magistrate Judge's order, finding the order "is not clearly erroneous or contrary to law," and "appropriately balance[s] the privacy rights of the minors involved in the Baker Act incidents with [Ms. Khoury's] need to obtain discovery in support of her Monell claim." The District Court rejected Ms. Khoury's third argument, saying that the order specifically directed the School Board's counsel to act neutrally, and if Khoury had "reason to believe that the communication is not neutral," she could file a motion.

In November 2017, Officer Williams and the School Board each moved for summary judgment. Ms. Khoury opposed both motions. The District Court granted summary judgment to both defendants in March 2018. Ms. Khoury timely

9

appealed from the summary judgment order and the order denying her third motion to compel the Baker Act records.

## II. STANDARDS OF REVIEW

We review de novo a grant of summary judgment, applying the same legal standards applied by the district court in the first instance. Yarbrough v. Decatur Hous. Auth., 941 F.3d 1022, 1026 (11th Cir. 2019). Summary judgment should be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1396 (11th Cir. 1994) (quotation marks omitted), opinion modified on other grounds on reh'g, 30 F.3d 1347 (11th Cir. 1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 1396 (quotation marks omitted and alteration adopted). "In other words, if a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Id. (quotation marks omitted and alterations adopted).

We review the District Court's ruling on discovery matters only for abuse of discretion. Smith v. Sch. Bd. of Orange Cnty., 487 F.3d 1361, 1365 (11th Cir. 2007) (per curiam). Therefore, "we will leave the district court's ruling on the motion undisturbed unless the district court has made a clear error of judgment, or has applied the wrong legal standard." Jordan v. Comm'r, Miss. Dep't of Corr., 947 F.3d 1322, 1326–27 (11th Cir. 2020) (quotation marks omitted), cert. denied, 141 S. Ct. 251 (2020).

### III.  DISCUSSION

Ms. Khoury raises three issues on appeal. First, she argues that in granting summary judgment to Officer Williams, the District Court erred by failing to view the facts and inferences in the light most favorable to her. Second, she says the District Court erred by granting summary judgment to the School Board on her Monell claim. Finally, she claims the District Court erred in upholding the Magistrate Judge's denial of her motion to compel unredacted Baker Act reports. We discuss each issue in turn.

A. THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF OFFICER WILLIAMS.

1. The False Arrest and First Amendment Retaliation Claims

The District Court granted summary judgment in favor of Officer Williams on two of Ms. Khoury's claims based on its finding that Williams had arguable probable cause to detain Khoury, concluding he was entitled to qualified immunity.

First, the District Court held that "[a]lthough [Ms. Khoury] contests that she did not exhibit the behaviors Officer Williams describes and that she did not push Officer Williams," Williams "had arguable probable cause to believe that . . . Khoury was a threat to herself or others." Based on this finding, the District Court found that Ms. Khoury's false arrest claims under both state and federal law, and her claim for First Amendment retaliation, were barred.

Ms. Khoury argues that the District Court "credited Officer Williams'[s] account of what happened that night instead of Khoury's account," and, as a result, it made an improper credibility determination to resolve a factual dispute at the summary judgment stage. This record supports her argument. The District Court recognized the dispute of facts, but then proceeded to impermissibly weigh the evidence and assess (and discount) Ms. Khoury's credibility.

### a. *The Qualified Immunity Standard*

Qualified immunity offers "complete protection for government officials sued in their individual capacities" when the official's conduct does not violate clearly established law. Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005) (quotation marks omitted). Therefore, if the District Court properly determined that Officer Williams is entitled to qualified immunity, we must affirm the grant of summary judgment in his favor.

12

In order to assert a qualified immunity defense, a government official must first establish that he was acting within his discretionary authority at the time of the challenged conduct. Mercado, 407 F.3d at 1156. Because there is no dispute Officer Williams was acting within his discretionary authority, the burden shifts to Ms. Khoury to show (1) that Williams "violated a constitutional right"; and (2) that the "right was clearly established at the time of the incident." Id. In order to meet her burden for the false arrest claims,[4] Ms. Khoury simply must show Officer Williams did not have probable cause to detain her. See Carter v. Butts Cnty., 821 F.3d 1310, 1319 (11th Cir. 2016) ("By now it is well established that '[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim.'" (quoting Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996)); Henley v. Payne, 945 F.3d 1320, 1329 n.2 (11th Cir. 2019) (holding that probable cause constitutes an absolute bar to § 1983 claims alleging false arrest); Bolanos v. Metro. Dade Cnty., 677 So. 2d 1005, 1005 (Fla. 3d DCA 1996) (per curiam) (holding that probable cause is a complete bar to state law false arrest claims). Ms. Khoury's First Amendment retaliation claim also turns on probable cause, so we must discuss that first. See Redd v. City of

---

[4] Ms. Khoury raised claims of false arrest against Officer Williams under both Florida law and the Fourth Amendment.

13

Enterprise, 140 F.3d 1378, 1383 (11th Cir. 1998) (holding that probable cause generally bars claims for First Amendment violations).

   b. *Arguable Probable Cause to Detain Ms. Khoury*

We, like the District Court, must look to the totality of the circumstances to determine whether arguable probable cause existed to detain Ms. Khoury under Florida's Baker Act. See Davis v. Williams, 451 F.3d 759, 763–64 (11th Cir. 2006). In order to involuntarily commit someone for a mental health examination under the Baker Act, the officer must have "reason to believe that the person has a mental illness and because of . . . her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to . . . herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1)(b)(2) (emphases added).[5] Arguable probable cause exists if a reasonable officer, knowing the information Officer Williams possessed, could have believed that probable cause existed to involuntarily commit Ms. Khoury. See Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1558 (11th Cir. 1993); Durruthy v. Pastor, 351 F.3d 1080, 1089 (11th Cir. 2003). Vague notions about what a person might do—for example, a belief about some likelihood that without treatment a person might cause some type of harm at some point—does not meet this standard.

---

[5] The Baker Act provides that an officer "shall take a person who appears to meet the criteria for involuntary examination into custody and deliver the person or have . . . her delivered to an appropriate, or the nearest, facility . . . for examination." Fla. Stat. § 394.463(2)(a)(2).

In this case, Officer Williams arrived at the scene as a result of a 911 call. When he arrived, he was told Ms. Khoury was "combative and aggressive" towards Ms. Zubilliaga when she asked Khoury to stop filming. Ms. Zubilliaga identified Ms. Khoury as the woman standing across the street. Officer Williams spoke to Ms. Khoury for three or four minutes, and she told him she believed the cars on the street were parked illegally. Officer Williams told Ms. Khoury the cars were legally parked and they had a right to be there. Ms. Khoury then "escalated a bit" and started questioning Officer Williams about why he opened the gate near the baseball field. At this point Officer Williams walked back across the street to explain to Ms. Zubilliaga that there was "absolutely nothing [he could] do" about Ms. Khoury filming because she had a First Amendment right to do so. Other people began to gather, and Officer Williams heard from them that this was not the first time Ms. Khoury had filmed near the field, and that she had been confrontational when asked to stop on earlier occasions. Based on this information alone, and before any altercation with Ms. Khoury, Officer Williams had already concluded—and in fact told Ms. Zubilliaga—that "personally I don't think she's well."

Despite this remark at the scene, Officer Williams testified he had not yet made the decision to detain Ms. Khoury. That came later, when, according to him, Ms. Khoury pushed him, they both fell to the ground, and while he was in the

15

process of trying to help her up, "she went to screaming that I was attacking her."

Officer Williams testified he believed Ms. Khoury was a threat to herself or others

because "her behavior itself became so erratic"; she was exhibiting "highs and

lows . . . rapid speech, yelling, rapid eye movement"; "she was actively resisting"

arrest; "she had placed her hands on" him; and "she had disorganized thoughts . . .

because at one point" Khoury recognized him as "a law enforcement officer and in

another point" she saw him as "the attacker and she wanted someone to call[] the

police" on him.

Ms. Khoury disputes all of these facts. See supra at 3–7. The District Court

acknowledged that the circumstances leading up to Officer Williams's decision to

detain Ms. Khoury pursuant to the Baker Act were disputed. Indeed, the court

recited that Ms. Khoury "contests that she did not exhibit the behaviors Officer

Williams describes and that she did not push Officer Williams." But the court

went on to find that Ms. Khoury did in fact push Officer Williams and was

exhibiting "concerning" and "odd" behaviors. In order to make these findings, the

District Court decided the testimony was two against one—Officer Williams's and

Ms. Zubilliaga's words against Ms. Khoury's. In doing this, the District Court

impermissibly weighed the evidence at the summary judgment stage. "When the

nonmovant has testified to events, we do not . . . pick and choose bits from other

witnesses' essentially incompatible accounts (in effect, declining to credit some of

16

the nonmovant's own testimony) and then string together those portions of the record" to form the story of the events.  Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc).  There is simply no basis for "imposing a corroboration gloss on Rule 56."  United States v. Stein, 881 F.3d 853, 858 (11th Cir. 2018) (en banc) (quotation marks omitted).  "[E]ven in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment." Id. (quotation marks omitted).

When viewing the facts in the light most favorable to Ms. Khoury, as we must, there are nothing but disputed facts on the matter of whether Officer Williams had probable cause.  According to Ms. Khoury, she was not being combative, aggressive, or threatening.  She testified she did not push Officer Williams and was not doing anything unlawful.  Officer Williams also testified that Ms. Khoury did not physically or verbally threaten anybody, including herself.

Officer Williams apparently concluded Ms. Khoury was a danger when, after Williams seized her, she began screaming she was being attacked.  See Oral Argument Recording at 15:32–16:05 (Feb. 11, 2020).  But in Ms. Khoury's mind, Officer Williams had gone "rogue" and she believed she needed another police agency to step in and protect her from an unlawful arrest.  The District Court found Ms. Khoury's explanation lacked credibility in light of the court's "independent review of the video" that showed "Officer Williams was not attacking her."  The

17

court essentially found that Ms. Khoury was delusional.  See Oral Arg. at 15:56–16:25.  But it was required to leave the credibility determinations and the drawing of legitimate inferences to the jury.  Cox, 17 F.3d at 1396.

If we are to properly perform the summary judgment inquiry, and credit Ms. Khoury's version of the facts, we must accept, for now, that Officer Williams twisted her arm behind her back simply because she was filming the scene.[6]  Ms. Khoury testified that Officer Williams pushed her—not the other way around, and the record shows Williams had already drawn the conclusion Khoury was "not mentally well" simply because she didn't take him at his word that the cars were parked legally.  But Officer Williams admits that Ms. Khoury was not violating the law or harming anyone by filming, and other eyewitnesses testified that Khoury was not a threat—her response was simply irrational.  Yet even if, as reflected by these facts, Ms. Khoury was acting strangely, that alone does not form a basis under which a reasonable officer would conclude that Khoury was a danger to herself or others.[7]  Thus based on the information known to Officer Williams, no

---

[6] No one disputes that Ms. Khoury had the right to film Ms. Zubilliaga and Officer Williams and was therefore engaged in lawful conduct.  See R. Doc. 160-3 at 10 (Officer Williams testified that Ms. Khoury had a First Amendment right to film the scene and informed Ms. Zubilliaga that "there's absolutely nothing I can do about her filming"); R. Doc. 188 at 20 ("[T]he Court recognizes that Plaintiff Khoury had a right to videotape Officer Williams.").

[7] Florida courts require more than erratic behavior or knowledge that a person is suffering from a mental illness.  Compare D.F. v. State, 248 So. 3d 1232, 1234 (Fla. 5th DCA 2018) (per curiam) ("[T]he mere fact that an individual might suffer from a mental illness is not sufficient standing alone to justify involuntary commitment."); Wade v. Ne. Fla. State Hosp., 655 So. 2d 125, 125 (Fla. 1st DCA 1995) (holding that conclusory testimony, unsubstantiated by the record,

18

arguable probable cause existed to conclude Ms. Khoury was a danger to herself or others.  See May v. City of Nahunta, 846 F.3d 1320, 1327–28 (11th Cir. 2017) ("In the context of a mental-health seizure, . . . the Fourth Amendment requires the officer to have probable cause to believe the person is dangerous either to h[er]self or to others." (quotation marks omitted)); Fla. Stat. § 394.463(1)(b)(2).

Because the District Court weighed testimony and made credibility determinations, it erroneously found that Officer Williams had arguable probable cause to detain Ms. Khoury.  We must therefore vacate the District Court's summary judgment order holding that Officer Williams had qualified immunity and that as a result, Ms. Khoury's false arrest claim was barred.

---

that a person has a "potential for aggression, and the possibility of substantial harm to his well-being" is insufficient to satisfy the criteria for a Baker Act order of continued involuntary placement for treatment); Blue v. State, 764 So. 2d 697, 698 (Fla. 1st DCA 2000) (per curiam) (holding that evidence that a person is "unstable," has "emotional outbursts [that] scare her family," is pleasant sometimes but "generally very argumentative and hostile," and caused conflicts with others is insufficient to satisfy the criteria for a Baker Act order of continued involuntary placement for treatment); Williams v. State, 522 So. 2d 983, 984 (Fla. 1st DCA 1988) (holding that the "mere need for treatment" for paranoid schizophrenia was insufficient to show that the appellant was a present danger to herself or others at the time she was ordered committed and explaining that "a non-dangerous individual, capable of surviving safely in freedom by herself or with the help of others, should never be involuntarily committed") with Lukehart v. State, 70 So. 3d 503, 517–18 (Fla. 2011) (detaining man who told officers he had tried to commit suicide earlier in the day and implicated himself in the murder of a child); Collins v. State, 125 So. 3d 1046, 1049 (Fla. 4th DCA 2013) (detaining man after family and neighbors expressed concern he might be a threat because of his "unwavering belief" that his neighbors kidnapped and murdered his child); Fleurant v. City of Port St. Lucie, No. 19-14032-CV, 2019 WL 12021806, at *6 (S.D. Fla. Nov. 14, 2019), report and recommendation adopted, No. 2:19-CV-14032, 2019 WL 12025012 (S.D. Fla. Dec. 10, 2019) (finding there was probable cause to believe man was dangerous to himself or others when officers knew he "was cutting up the house with a machete and acting strangely"; siblings said he "was going crazy" and needed a mental examination; and he told officers "to go ahead and kill him") (quotation marks omitted).

19

c. *The First Amendment Retaliation Claim*

As discussed, the District Court found that Officer Williams was entitled to qualified immunity on Ms. Khoury's First Amendment claim because he had arguable probable cause to detain her under the Baker Act, "even if she was exercising her First Amendment right when that decision was made." In reaching that finding, the District Court held that Ms. Khoury could not state a First Amendment retaliation claim. That was error, and Officer Williams is not entitled to summary judgment on this claim.

Because it is undisputed that Officer Williams was acting within the scope of his discretionary authority, the burden is on Ms. Khoury to establish that Officer Williams violated her First Amendment rights, and that those rights were clearly established at the time of the 2015 incident. Mercado, 407 F.3d at 1156.

First, in order to show Officer Williams retaliated against her in violation of the First Amendment, Ms. Khoury must establish that (1) her speech was constitutionally protected, (2) the defendant's retaliatory conduct adversely affected the protected speech, and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005).

It is undisputed that Ms. Khoury has established the first element. The District Court found, and Officer Williams agrees, that Ms. Khoury's filming of

20

Officer Williams and the surrounding area is protected by the First Amendment. See Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000). This right is also clearly established under these circumstances.[8] See id.

Ms. Khoury has also established the second element required for First Amendment retaliation. Retaliatory conduct adversely affects protected speech if the conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bennett, 423 F.3d at 1254. A person of ordinary firmness would surely be deterred from exercising her First Amendment rights after being detained without probable cause; suffering a dislocated elbow—which required surgery—while being detained; and being involuntarily committed and forced to undergo a mental health examination.

Finally, questions of fact remain as to the third element of Ms. Khoury's First Amendment retaliation claim, which addresses whether there is a causal

---

[8] The facts of this case are a far cry from those in Crocker v. Beatty, 995 F.3d 1232 (11th Cir. 2021), in which a bystander who was "spectating on the median of a major highway at the rapidly evolving scene of a fatal crash" and was "arguably in violation" of Florida law did not have a clearly established right to take pictures of the scene with his cell phone. Id. at 1237–38, 1241–42 (quotation marks omitted)). Notably, Officer Williams recognizes that Ms. Khoury was not violating any laws or harming anyone while she was filming and that he knew Khoury had a First Amendment right to film the scene (and informed Ms. Zubilliaga of the same). R. Doc. 160-3 at 10. Additionally, School Board Chief of Police Ian Moffett testified that it was department policy "that the public has a right to record" officers and acknowledged "[t]here's nothing illegal about filming somebody, but the officer has a right to inquire why somebody is filming him." R. Doc. 151-18 at 27, 31. Therefore, under these circumstances, every reasonable police officer in Officer Williams's position would have known—and in fact did know—that Ms. Khoury had a right to videotape the scene.

connection between the retaliatory actions and the adverse effect on speech.

Bennett, 423 F.3d at 1250.  As previously discussed, there is a significant dispute

about the circumstances leading up to Officer Williams's decision to detain Ms.

Khoury under the Baker Act.  When viewed in the light most favorable to Ms.

Khoury, we must accept for now that Officer Williams twisted her arm behind her

back and detained her simply because she was filming the scene.  And it is clearly

established that a person has the right to be free from retaliation for exercising her

First Amendment freedoms.  See id. at 1255–56 ("This Court and the Supreme

Court have long held that state officials may not retaliate against private citizens

because of the exercise of their First Amendment rights.").  "The reason why such

retaliation offends the Constitution is that it threatens to inhibit exercise of the

protected right."  Id. at 1253 (quotation marks omitted).  Because a genuine dispute

of material fact exists as to whether there was a causal connection between Ms.

Khoury's speech and the alleged retaliatory action by Officer Williams, we hold

the District Court improperly granted summary judgment in favor of Officer

Williams on Khoury's First Amendment retaliation claim.

    2.  The Excessive Force Claim

    In addition to its finding that Officer Williams was entitled to qualified

immunity because he had arguable probable cause to arrest Ms. Khoury, the

District Court found that the facts and law did not support Khoury's excessive

force claim because Williams used an appropriate level of force. When analyzing a typical excessive force claim, we would decide whether Officer Williams's use of force was excessive in violation of the Fourth Amendment.[9] But here, Ms. Khoury argues only that Officer Williams used excessive force because Officer Williams "had no cause whatsoever" to detain her. When, like here, an excessive force claim "is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim." Bashir v. Rockdale Cnty., 445 F.3d 1323, 1332 (11th Cir. 2006). Because Ms. Khoury is arguing only that any force was excessive because of the lack of probable cause, this claim is subsumed by the false arrest claims and thus fails as a matter of law. Cf. Hardigree v. Lofton, 992 F.3d 1216, 1231 n.7 (11th Cir. 2021) (explaining that excessive force claim was not subsumed by unlawful arrest claims because the plaintiff also argued that even if there was probable cause, the force was constitutionally unreasonable). Nevertheless, Ms. Khoury can still recover damages for the force Officer Williams used to detain her. Bashir, 445 F.3d at 1332 ("[T]he damages recoverable on an unlawful arrest claim include damages suffered because of the use of force in effecting the arrest." (quotation marks omitted)).

---

[9] The District Court performed this analysis, finding that Ms. Khoury's active resistance to Officer Williams's efforts to detain her "alone weighs in favor of finding that Williams's actions were reasonable under the circumstances."

B. THE DISTRICT COURT DID NOT ERR BY GRANTING SUMMARY
JUDGMENT TO THE SCHOOL BOARD ON MS. KHOURY'S MONELL
CLAIM

Ms. Khoury also appeals the District Court's grant of summary judgment to the School Board on her Monell claim. Municipalities like the School Board may only be held liable under § 1983 if "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell, 436 U.S. at 691, 98 S. Ct. at 2036. Municipal liability may be based on, among other things, "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Church v. City of Huntsville, 30 F.3d 1332, 1342–43 (11th Cir. 1994). Under that theory, which is the only argument properly before us,[10] a plaintiff may establish a policy or custom exists by showing a "persistent and wide-spread practice" and the government's actual or constructive knowledge of that practice. Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). Generally, "random acts or isolated incidents are insufficient to establish a custom or policy." Id. In essence, to impose liability, Ms. Khoury must show: "(1) that [her] constitutional rights were violated; (2) that the municipality had a custom . . . that constituted deliberate indifference to that constitutional right; and

---

[10] On appeal, Ms. Khoury claims for the first time that the School Board's Standard Operating Procedure constitutes a formal written policy instituted by a final policymaker, which provides another basis for Monell liability. Because we have "repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court," we will not address Ms. Khoury's formal policy argument further. Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) (quotation marks omitted).

24

(3) that the . . . custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). Ms. Khoury's evidence is not sufficient to create a dispute of fact as to whether the School Board had a pervasive custom or practice of improperly committing people for an involuntary mental health examination under the Baker Act.

In order to show the School Board had a pervasive practice or custom of involuntarily committing "people who did not qualify" under the Baker Act, Ms. Khoury relies on the testimony of "the School Board's whistleblowing employees," teachers, principals, and staff. There is some indication that the School Board investigated an overreliance on use of the Baker Act in 2012. The Chairperson of the Crisis Management Program for Miami-Dade County Public Schools testified that on several occasions, his previous supervisor promoted reliance on the Baker Act when officers did not think it was warranted. One detective also testified that in 2012, he notified the School Board that the Baker Act was being used to manipulate crime statistics under then-Chief of Police Charles Hurley. The administrative officer to Chief Hurley testified that she had been concerned about an increase in Baker Act incidents and a corresponding reduction of arrests at the time. She had received phone calls complaining about the School Board's Crisis Management Program's reliance on the Baker Act. There was also evidence that Chief Hurley's administrative officer had passed

25

information about Chief Hurley's misuse of the Baker Act to manipulate crime statistics up the chain of command.

Upon receiving complaints made against Chief Hurley, the Florida Department of Law Enforcement conducted an inquiry, but ultimately decided there was not enough information to justify a criminal investigation. The School Board Police Department conducted a second review, which was led by former Chief of Police Gerald Kitchell. Chief Kitchell found "'no validity' to the allegation that Chief Hurley 'reduced arrests by directing officers to initiate Baker Acts,' despite not interviewing individuals who had submitted complaints, or individuals who had seen or been subject to a Baker Act arrest." A third review was completed after Ian Moffett became Chief of Police in May of 2013. That review revealed that a significant number of Baker Act incidents occurred before Moffett became Chief, that they were all in compliance with the statute, and that since his appointment, the number of Baker Act incidents had dropped every year since the 2012–2013 academic year.[11]

In addition to the facts above, Ms. Khoury cites to testimony from the School Board's non-law enforcement employees regarding seven incidents that occurred in 2013 and 2016 to support her assertion that there is a custom or

---

[11] There was a total 64% reduction in Baker Act incidents from the 2012–2013 academic year to the 2015–2016 academic year.

practice of relying on the Baker Act when it does not apply. The District Court recounted each reported incident, which involved: (1) a student who threw a shoe at a security monitor after refusing to take her diabetes medication; (2) a student who attempted to assault a teacher; (3) a student who had been in a physical altercation with two students and said he was going to kill them using a gun; (4) a student who was found with a knife in his pocket; (5) a student who hit a security monitor in the head after the security monitor attempted to diffuse an argument between the student and his sister; (6) a student who had been in an altercation with another student and then yelled at the principal and refused to comply with the principal's demands; and (7) a student who had been caught smoking tobacco in the school bathroom.

The District Court held that Ms. Khoury failed to provide evidence of a custom or practice on three grounds. First, although there may be some evidence suggesting "there were forces encouraging the . . . [use of] the Baker Act in 2012, [Ms. Khoury] has not pointed to evidence suggesting this practice continued beyond that period." Second, the Baker Act incident reports Ms. Khoury relied on were distinguishable from her case because "there is no dispute that the other incidents involved Baker Act detentions of students during school hours." Finally, the incidents Ms. Khoury relied on that occurred in 2013 and 2016 did not "result[] in complaints or findings that the Baker Act was improperly relied upon"—and, in

27

fact, simply "describe[] other examples of when the School Board police thought employing the Baker Act was warranted, which is insufficient to show a constitutional violation."

We agree the evidence Ms. Khoury relies on is either too remote in time or does not show a constitutional violation. The evidence from 2012, which suggests there may have been an issue with the School Board improperly Baker Acting students "to dilute arrests" under former Chief Hurley, occurred three years before Ms. Khoury was detained. See Church, 30 F.3d at 1346 (holding that one 1991 study's single use of the word "rousted" was "not conclusive" as to the existence of City effort to expel the homeless in 1993). Chief Hurley is no longer the Chief of Police and Chief Moffett who replaced him appears to have remedied any problem stemming from that administration. Cf. Skop v. City of Atlanta, 485 F.3d 1130, 1145 (11th Cir. 2007) (noting that the city's discipline of an officer "suggests that [the officer's] actions were inconsistent with [the police department's] goals and training" and affirming grant of summary judgment to the city on Monell claim). Neither is there any evidence indicating the Baker Act incidents in 2013 and 2016 were unwarranted. As such, Ms. Khoury has not established that there were prior constitutional violations. See Church, 30 F.3d at 1345–46 (arrests for public intoxication were not evidence of deliberately indifferent custom because the arrestees were intoxicated).

28

Without evidence establishing a pervasive custom or practice of committing people who did not qualify for an involuntary mental health examination pursuant to the Baker Act, Ms. Khoury's detention must be evaluated as a single incident. Simmons v. Bradshaw, 879 F.3d 1157, 1168 (11th Cir. 2018). Even assuming there is an issue of fact as to whether Officer Williams had probable cause to detain Ms. Khoury, and that her detention may have been unconstitutional, "this incident alone does not establish a custom" and Khoury's Monell claim must fail. Id. at 1168–69.

C.  THE MAGISTRATE JUDGE'S ORDER ON MS. KHOURY'S MOTION TO COMPEL WAS NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW.

Federal Rule of Civil Procedure 72 governs both nondispositive and dispositive pretrial orders of magistrate judges. See Fed. R. Civ. P. 72(a)–(b). A party may object to a nondispositive order, but the district judge must only "consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); see also Jordan, 947 F.3d at 1327.

As we have described, Ms. Khoury sought to contact and elicit testimony from students who were Baker Acted by School Board Police in order to prove her claims. Ms. Khoury claims the Magistrate Judge's denial of her motion to compel

29

was done "without analyzing the facts, case law, or relevant statute regarding the disclosure [of] this information," and thus was clearly erroneous.

This argument fails.  The District Court's rulings are in keeping with Florida's interest in protecting minor students' privacy rights and courts' interest in limiting the burden on non-parties to litigation.  Cf. Berkeley v. Eisen, 699 So. 2d 789, 791 (Fla. 4th DCA 1997) (quashing discovery order compelling production of addresses because "[t]he fact that the party seeking discovery may already have some of the information sought does not negate the rights of such non-parties to privacy and confidentiality as to their personal information" (quotation marks omitted and alterations adopted)); Miller v. Savanna Maint. Ass'n Inc., 979 So. 2d 1235, 1237 (Fla. 4th DCA 2008) ("In assessing discovery requests the trial court must balance the competing interests of a litigant's need to know information relevant to the case with a non-party's privacy interest in the information.").  And, because we affirm the District Court's grant of summary judgment to the School Board on Ms. Khoury's Monell claim, this discovery ruling did not "result[] in substantial harm" to Khoury's case.  Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir. 2003) (quotation marks omitted).

## IV.  CONCLUSION

For these reasons, we **AFFIRM** the District Court's order granting summary judgment to Officer Williams on Ms. Khoury's excessive force claim, but

**REVERSE** the remaining portions of the order and **REMAND** Ms. Khoury's false arrest and First Amendment retaliation claims to the District Court for further proceedings.  We **AFFIRM** the District Court's order granting summary judgment to the School Board.