[DO NOT PUBLISH]

In the

## United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-10503

_____

MATTHEW SCHANTZ,

Plaintiff-Appellant,

*versus*

BENNY DELOACH,
former Sheriff of Appling County, Georgia,
in his individual capacity,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:17-cv-00157-LGW-BWC

_____

Before JORDAN, BRASHER, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiff appeals the district court's order granting qualified immunity to Defendant on Plaintiff's § 1983 excessive force claim based on Defendant's use of deadly force during a high-speed chase that Plaintiff initiated when he ran from police on his motorcycle. After granting summary judgment to Defendant on Plaintiff's § 1983 claim, the district court declined to exercise jurisdiction over Plaintiff's remaining state claims and dismissed those claims without prejudice. Plaintiff appeals both the qualified immunity ruling on his § 1983 claim and the dismissal of his state claims. Having carefully reviewed the record and the briefs, and after oral argument, we find no error and thus affirm the district court.

## BACKGROUND

On the afternoon of June 17, 2016, Plaintiff Matthew Schantz was driving his motorcycle from Perry, Georgia to St. Simons Island, where he planned to meet his mother at the beach. Plaintiff smoked marijuana prior to leaving Perry that morning, and he had marijuana on his person as drove from Perry to St. Simons.

While traveling south on Highway 341 through Appling County on route to St. Simons, Plaintiff passed Appling County police officer Tim Sullivan, who was driving on the opposite side of the highway. Officer Sullivan made a U-turn and began following

Plaintiff.  After pacing Plaintiff for a mile or two, Sullivan pulled up behind Plaintiff and activated his blue lights. Plaintiff did not have a registration tag on his motorcycle, but he did not believe he had committed any other traffic violations.  Nevertheless, Plaintiff decided to take off instead of stopping, in part because he had marijuana on him at the time and he did not want to go to jail.[1]

When Plaintiff accelerated rather than stopping, Officer Sullivan pursued Plaintiff and a high-speed chase ensued.  Several other Appling County officers eventually joined the chase as Plaintiff continued driving south down Highway 341, away from Sullivan.  Appling County Sheriff's Deputy Robert Eunice became aware of the chase while he was monitoring radio traffic.  Soon thereafter, Eunice joined the chase and became the lead pursuit vehicle.

Eunice recalled that the chase reached speeds well in excess of 100 miles per hour as Plaintiff drove away from the officers pursuing him through Appling County, and Plaintiff did not dispute that he drove at speeds of up to 130 miles per hour and that he ran a red light in downtown Baxley, Georgia while trying to evade the officers.  Plaintiff testified that the officers tried to get him to stop

---

[1]  This was not the first time Plaintiff had run from police trying to conduct a traffic or investigatory stop.  Plaintiff was arrested after trying to outrun police on a different motorcycle in 2015.  Then in April 2016, Plaintiff ran from the Cobb County police on foot to avoid being caught with marijuana.  An eluding charge related to that incident was dropped, but Plaintiff served nearly a month in jail and was put on probation for possession of marijuana.

by pulling in front of him on the highway, but that he managed to swerve around and accelerate away from them. The Appling County officers pursued Plaintiff down Highway 341 towards Wayne County until they lost sight of him, at which time they temporarily discontinued the chase.

At some point during the chase, Wayne County Sheriff's Captain Kenny Poppell, who was in an unmarked patrol car headed north on Highway 341 towards Odum, Georgia, heard a call over the radio about the chase in Appling County. A few minutes later, Poppell saw a single headlight from a motorcycle driving south on Highway 341 towards him, which he suspected was the motorcycle involved in the chase. Wanting to investigate, Poppell turned onto the southbound lane of the highway and began driving at about 90 miles per hour in the same direction the motorcycle was traveling. Plaintiff, who Poppell testified was laying across the fuel tank of the motorcycle in a "race mode" stance, caught up to and passed Poppell.

Poppell eventually lost sight of Plaintiff after he passed by on his motorcycle. Assuming Plaintiff had turned off Highway 341 onto a side road, Poppell decided to drive to Odum, to see if he could catch up with Plaintiff there. After he reached Odum, Poppell caught sight of Plaintiff again, and this time Poppell saw Plaintiff cross two large speed bumps at a high rate of speed and while driving only on the rear wheel of his motorcycle. Poppell testified that he then saw Plaintiff turn back onto the northbound lane of Highway 341. Poppell stated that after Plaintiff turned back north

on Highway 341, he drove in the opposing lane of the highway to evade two patrol cars that were pursuing him, running the oncoming southbound traffic off the road.  However, Plaintiff denied that he encountered any traffic other than patrol cars at this point during the chase, and we again assume that is true for purposes of this appeal.

As Plaintiff's chase proceeded from Appling into Wayne County and back towards Appling County again, officers from both police departments shared details about the continuing chase over radio traffic.  As noted, Wayne County Sheriff's Captain Poppell learned about the chase by listening to radio traffic coming in from Appling County.  Likewise, Appling County officers and Defendant Benny DeLoach, the Sheriff of Appling County at the time[2], learned about Plaintiff's whereabouts and his activities after he left Appling County by listening to Wayne County radio traffic. Audio excerpts from Appling and Wayne County radio traffic during the relevant time period report Plaintiff engaging in a number of reckless activities during the chase, including:  (1) traveling at a speed of 130 miles per hour, (2) "zipping around some big trucks," (3) "coming into heavy traffic" and weaving "in and out of traffic," (4) driving into "oncoming traffic," (5) doing a "wheelie," and (6) "not slowing up for anything."

Plaintiff acknowledges that the Appling and Wayne County radio traffic accurately describes some of his conduct during the

---

[2] DeLoach retired from his position as Sheriff on December 31, 2016.

chase.  Again, Plaintiff did not dispute that he traveled at speeds in excess of 100 miles per hour and up to 130 miles per hour and that he had to swerve around and perform other evasive maneuvers to avoid officers who were pursuing him during the chase.  In addition, Plaintiff admitted that he "popped wheelies," drove into the opposing lane of the highway, and ran a red light in downtown Baxley, Georgia.

Plaintiff disputes certain facts reported in the radio traffic—for example, Plaintiff claims there was no traffic on the road during the chase, and he insists that his driving did not pose a danger to other motorists or pedestrians because he kept a "diligent lookout" throughout the chase.  But regardless of how safely Plaintiff believes he was driving and whether Plaintiff in fact encountered other civilian motorists during the chase, it is undisputed that—in addition to traveling at an extremely high rate of speed, swerving around patrol cars, and running a red light in a downtown area, all of which Plaintiff admits to and was observed doing in Appling County—Defendant heard reports over radio traffic that Plaintiff was weaving in and out of traffic, heading into oncoming traffic, and driving on the wrong side of the road, all while still driving at speeds in excess of 100 miles per hour, as the chase continued through Wayne County.

After he turned north onto Highway 341 in Wayne County and drove back towards Appling County for some time, Plaintiff eventually reached the intersection of Highway 341 and Brentwood Road, near the border of Wayne and Appling Counties.

Defendant and Eunice, who knew via Wayne County radio traffic that Plaintiff was headed back towards Appling County, had taken up positions at the intersection. When Eunice noticed Plaintiff speeding up as he approached the intersection, he pulled his truck off the road and allowed Plaintiff to "zigzag around" him. Eunice then backed his truck up onto the highway and began chasing Plaintiff again. Shortly thereafter, Plaintiff's motorcycle slid to a stop. By the time Plaintiff stopped, he had engaged in what he acknowledged was a "long chase." Defense counsel estimated that the chase had lasted at least 30 miles based on the distance between Baxley to Odum. Plaintiff could not confirm the exact distance, but we take judicial notice of the fact that Baxley is approximately 22 miles from Odum, meaning that the chase had to have lasted for at least that distance.

Defendant was standing in front of his patrol car when Plaintiff's motorcycle came to a stop after zigzagging around Eunice. As the motorcycle slid to a stop, Defendant fired one shot from his shotgun, which was loaded with buckshot. Defendant testified that he fired this first shot into the air as a warning, but Plaintiff claims Defendant fired the shot directly towards him. According to Plaintiff, he saw Defendant point the shotgun at him and he subsequently heard the ping of a projectile strike against metal and the pavement below.

Whatever Defendant's intent, his first shot missed Plaintiff. Plaintiff momentarily stopped his motorcycle and put at least one of his hands up, but he quickly put both hands back on the throttle

and restarted the motorcycle. Defendant testified that the motor-cycle was headed directly towards him when Plaintiff restarted it, but Plaintiff claims he was trying to flee the officers rather than drive toward them and that the motorcycle was pointed away from Defendant at the time. We assume the latter is true for purposes of this appeal. It is undisputed that when Plaintiff restarted his mo-torcycle, Defendant fired a second shot, this time directly at Plain-tiff, causing buckshot to penetrate Plaintiff's helmet, face, and neck. Construing the facts in favor of Plaintiff, he then complied with Eunice's command to stop and surrender.[3]

Plaintiff subsequently filed this action against Defendant in his individual capacity, asserting a Fourth Amendment excessive force claim under § 1983 as well as various state claims. Following discovery, Defendant moved for summary judgment as to all of Plaintiff's claims. The district court held a hearing on the summary judgment motion and gave the parties an opportunity to supple-ment the record. Thereafter, the court granted summary judg-ment to Defendant as to Plaintiff's Fourth Amendment § 1983 claim on the ground of qualified immunity. The court then de-clined to exercise pendant jurisdiction over Plaintiff's remaining state claims, and it dismissed those claims without prejudice and without considering the merits. Plaintiff appealed the district

---

[3] Defendant testified that Plaintiff laid his bike down and began running to-wards the woods after he was shot, but Plaintiff denies running. We assume Plaintiff's version of the facts is true for purposes of this appeal.

court's summary judgment ruling on his § 1983 claim, as well as the court's dismissal of his state claims.

## DISCUSSION

### I.    Standard of Review

We review the district court's grant of summary judgment based on qualified immunity de novo, and we apply the same legal standards as the district court. *Khoury v. Miami-Dade Cty. Sch. Bd.*, 4 F.4th 1118, 1124 (11th Cir. 2021). In conducting our review, we resolve any factual disputes in favor of Plaintiff and then decide whether Defendant is entitled to qualified immunity under Plaintiff's version of the facts. *Id.* at 1124–25. *See also Tolan v. Cotton*, 572 U.S. 650, 656 (2014). We acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quotation marks omitted). Nevertheless, we view the facts from Plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove" but whether "certain given facts" demonstrate a violation of clearly established law. *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).

### II.    Plaintiff's Fourth Amendment Excessive Force Claim

#### A.    Qualified Immunity

Qualified immunity "completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established

statutory or constitutional rights of which a reasonable person would have known." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (quotation marks omitted).  To be clearly established, the contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quotation marks omitted).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate" and given the official fair warning that his conduct violated the law. *Id.* at 1152 (quotation marks omitted).  Fair warning is usually provided by "materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018). "Authoritative judicial decisions" may also "establish broad principles of law that are clearly applicable to the conduct at issue." *Id.* (quotation marks omitted).  And very occasionally, "it may be obvious from explicit statutory or constitutional statements that conduct is unconstitutional." *Id.* at 1296–97 (quotation marks omitted).

A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action. *See Patel v. Lanier Cty.*, 969 F.3d 1173, 1181 (11th Cir. 2020).  Assuming the defendant makes the required showing, the burden shifts to the plaintiff to show that qualified immunity is not warranted by alleging (1) the violation of a constitutional right, (2)

which right was clearly established at the time of the alleged misconduct. *See id.* Plaintiff does not dispute that Defendant was acting in his discretionary authority when Defendant used deadly force while trying to apprehend Plaintiff during the chase that occurred on June 17, 2016. The burden thus lies with Plaintiff to show that Defendant's use of deadly force under the circumstances violated a constitutional right and that the right was clearly established at the time of the incident. The district court bypassed the first prong of the analysis and granted summary judgment to Defendant based on the lack of clearly established law that would have put Defendant on notice that his conduct was unlawful.

As discussed below, we agree with the district court's decision to dispose of Plaintiff's § 1983 claim on the clearly established prong of the qualified immunity analysis. Assuming Plaintiff's motorcycle was not headed directly towards Defendant when Plaintiff was shot, reasonable minds could perhaps disagree as to whether his use of deadly force under the circumstances violated the Fourth Amendment. But Plaintiff does not cite, and we have not found, any clearly established law that would have given Defendant fair warning that his use of deadly force to bring an end to Plaintiff's high-speed chase was excessive or otherwise unreasonable given the events that immediately preceded the shooting. Defendant is thus entitled to qualified immunity.

### B.    Excessive Force under the Fourth Amendment

Plaintiff's excessive force claim is analyzed under the objective reasonableness standard of the Fourth Amendment. *Plumhoff*

v. Rickard, 572 U.S. 765, 774 (2014) (citing Graham v. Connor, 490 U.S. 386 (1989) and Tennessee v. Garner, 471 U.S. 1 (1985)). Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010). We view those circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Plumhoff, 572 U.S. at 775 (quotation marks omitted). And we consider the fact that officers often must "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. (quotation marks omitted).

To determine whether an officer has used excessive force under the above standard, we weigh the level of force used against (1) the severity of the suspect's crime, (2) the immediacy of the threat posed by the suspect to the safety of the officers or others, and (3) whether the suspect sought to evade or resist arrest. See Kisela, 138 S. Ct. at 1152. Applying those factors, this Court has held that an officer may constitutionally use deadly force when: (1) he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or that the suspect "has committed a crime involving the infliction or threatened infliction of serious physical harm," (2) he "reasonably believes that the use of deadly force [i]s necessary to prevent escape" and (3) he "has given some warning about the possible use

of deadly force, if feasible." *McCullough*, 559 F.3d at 1206 (quotation marks omitted).

There is no question it would have been reasonable for Defendant to use deadly force to protect himself if Plaintiff had restarted his motorcycle and aimed it directly at Defendant, as Defendant claims. *See id.* at 1207–08 (describing several cases where this Court has authorized the use of deadly force against a suspect who was endangering an officer's life with his vehicle). But at this stage of the litigation, we must construe the testimony and the physical evidence in the light most favorable to Plaintiff. *See Tolan*, 572 U.S. at 657 (warning against importing "genuinely disputed factual propositions" into the analysis when deciding a motion for summary judgment on qualified immunity grounds). Plaintiff testified that he was trying to flee rather than drive towards the officers, and that his motorcycle was pointed away from Defendant when he was shot. Assuming Plaintiff's version of the facts is true, it is a closer question whether Defendant's use of deadly force against Plaintiff violated the Fourth Amendment. As such, we proceed directly to the clearly established law prong of the analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (concluding that courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

## C.    Clearly Established Law

Even assuming a Fourth Amendment violation, Defendant is entitled to qualified immunity unless Plaintiff can point to some

clearly established law that would have made it apparent to Defendant at the time of the shooting that his conduct was unconstitutional.  As discussed, the "salient question" on this prong of the analysis is whether the preexisting law at the time of the shooting gave "fair warning" to Defendant that his use of deadly force was unconstitutional under the circumstances that confronted Defendant when he shot Plaintiff.  *See Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (quotation marks omitted).  Plaintiff does not cite, and we have not found, any such clearly established law.

To briefly recap the relevant undisputed facts, Plaintiff initiated the high-speed chase that culminated in his shooting when he ignored Appling County Officer Sullivan's clear mandate to stop after Sullivan pulled behind Plaintiff's motorcycle and activated his blue lights.  It is undisputed that Plaintiff subsequently led multiple officers on a lengthy chase through Appling and Wayne Counties, during which Plaintiff concedes he swerved and zigzagged around patrol cars, ran a red light in a downtown area, popped wheelies, and made U-turns on Highway 341—all while traveling at speeds in excess of 100 miles per hour and reaching up to 130 miles per hour.  It is also undisputed that Defendant, when he encountered Plaintiff heading back towards Appling County at the intersection of Highway 341 and Brentwood Road, had heard reports over Wayne County radio traffic that Plaintiff had continued the chase through Wayne County, that he was still driving at speeds in excess of 100 miles per hour, that he was weaving in and out of traffic and heading into oncoming traffic while driving on the wrong side of

the road, and that he was not stopping or slowing down "for anything."

Soon after Plaintiff encountered Defendant and Eunice where they had set up positions at the Brentwood Road intersection of Highway 341, Defendant fired one round from his shotgun that missed Plaintiff. Plaintiff's motorcycle slid to a stop and he momentarily put at least one hand up. But instead of keeping his hands up and stopping, Plaintiff quickly returned his hands to the throttle and restarted his motorcycle. When Plaintiff restarted his motorcycle, Defendant fired a second round from his shotgun, this time hitting Plaintiff. Plaintiff was injured when he was struck in the helmet, neck, and face by buckshot from the second shot that Defendant fired.

Again, we assume that Plaintiff was not driving his motorcycle towards Defendant when he was shot, which clearly would have authorized Defendant's use of deadly force to protect his own life. Nevertheless, a reasonable officer in Defendant's position could have concluded at the time of the shooting that Plaintiff intended to resume the chase he had initiated earlier. Indeed, Plaintiff admitted that he was trying to flee from the officers when he was shot. The determinative question on the clearly established law prong of the analysis is thus whether an officer in Defendant's position at the time of the shooting—with all the information Defendant possessed about Plaintiff's conduct during the chase up to that point and with the reasonable belief that Plaintiff intended to continue the chase if allowed to escape—would have known, based

on preexisting law, that it violated the Fourth Amendment to use deadly force against Plaintiff to bring an end to the chase. We think not.

The most factually similar precedent from the Supreme Court is *Plumhoff v. Rickard*, 572 U.S. 765 (2014). In *Plumhoff*, an officer pulled over a car for a headlight violation and, noticing a large indentation in the windshield, asked the suspect driver if he had been drinking. *See id.* at 768–69. The suspect responded that he had not been drinking, but the officer asked him to step out of the car when he failed to produce his driver's license. *See id.* at 769. Rather than complying with the officer's request, the suspect sped away, initiating a high-speed chase down I-40 that ultimately was joined by five additional officers. *See id.* During the chase, the suspect swerved through traffic at speeds that reached over 100 miles per hour. *See id.*

The officers pursuing the suspect in *Plumhoff* were unsuccessful in their attempt to stop the suspect's car with a "rolling roadblock" on I-40, but there was a brief pause in the chase when the suspect exited the interstate, spun out in a parking lot after his car made contact with one of the patrol cars that was pursuing him, and momentarily came to a stop after colliding with another patrol car. *See id.* The suspect quickly began attempting to escape by maneuvering and accelerating his car. *See id.* As the suspect's tires started spinning and his car began to rock back and forth, one of the officers fired three shots into the car. *See id.* at 770. The suspect then put his car in reverse and maneuvered onto another

street, at which time the officers fired twelve shots into his car, causing him to lose control and crash into a building. *See id.*

The suspect in *Plumhoff* died[4] from a combination of gunshot wounds and the injuries he suffered in the crash that ended the chase. *See id.* His surviving daughter asserted a § 1983 claim against the individual officers involved in the chase, alleging that their use of deadly force against her father was excessive and violated the Fourth Amendment. *See id.* The officers moved for summary judgment based on qualified immunity, but the district court denied their motion and the Sixth Circuit affirmed. *See id.* The Supreme Court granted certiorari and reversed, disagreeing with the lower courts as to both the question whether the suspect's Fourth Amendment rights had been violated as well as the question whether any such violation was clearly established at the time of the incident. *See id.* at 768, 771.

On the constitutional violation prong, the Court in *Plumhoff* cited *Scott v. Harris*, 550 U.S. 372 (2007) for the rule that an officer's "attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *See Plumhoff*, 572 U.S. at 776 (quotation marks omitted). According to the Court, that rule—determinative in *Scott*—likewise governed *Plumhoff*, which involved a

---

[4] The suspect's passenger also died of gunshot wounds and other injuries. *See Plumhoff*, 572 U.S. at 770.

chase that "exceeded 100 miles per hour and lasted over five minutes" and during which the suspect's "reckless driving posed a grave public safety risk." *See id.* That was true even though the suspect's car "came temporarily to a near standstill" prior to the shooting because the suspect "resumed maneuvering his car" within seconds, attempting—and managing briefly—to escape. *See id.* Given those facts, the Court explained, "all that a reasonable police officer could have concluded" when the shots were fired was that the suspect "was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *See id.* at 777. Thus, the Court concluded, "it is beyond serious dispute that [the suspect's] flight posed a grave public safety risk" and that "the police acted reasonably in using deadly force to end that risk." *Id.*

The Supreme Court in *Plumhoff* held further that, even if the suspect's Fourth Amendment rights <u>had</u> been violated, the officers who shot him would be entitled to qualified immunity. *See id.* at 778–81. Citing *Brosseau v. Haugen*, 543 U.S. 194 (2004), the Court noted that it had in 2004—the same year as the chase and shooting at issue in *Plumhoff* occurred—surveyed the existing precedent regarding the "reasonableness of lethal force as a response to vehicular flight" and concluded that:

> a police officer did not violate clearly established law
> when she fired at a fleeing vehicle to prevent possible
> harm to other officers on foot who she believed were
> in the immediate area, occupied vehicles in the

> driver's path, and any other citizens who might be in
> the area.

*Id.* at 779 (quotation marks omitted) (alterations adopted). The Court in *Brosseau* only considered cases that predated the shooting at issue in that case, which occurred in February 1999. *See id.* Still, *Brosseau* made it plain, the Court explained in *Plumhoff,* that it was not clearly established as of February 1999 that "it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." *See id.* Immunity was thus required for the officers in *Plumhoff* unless the plaintiff could distinguish *Brosseau* or cite some authority that had emerged between 1999 and 2004 showing that the suspect's shooting in 2004 clearly was unconstitutional. *See id.* at 780. The plaintiff in *Plumhoff,* the Court said, could do neither. *See id.*

A little over a year after *Plumhoff* was decided, and just seven months before Plaintiff's shooting in June 2016, the Supreme Court again granted summary judgment to an officer who was sued under § 1983 for shooting a suspect during a high-speed car chase. *See Mullenix v. Luna*, 577 U.S. 7, 19 (2015). The suspect in *Mullenix* initiated the chase when he fled in his car from an officer who was trying to serve a warrant for his arrest. *See id.* at 8. Other officers joined the chase, which continued for about 18 minutes down the interstate at speeds between 85 and 110 miles per hour. *See id.* Two times during the chase, the suspect called the police dispatcher claiming to have a gun and threatening to shoot the officers if they continued their pursuit. *See id.* The dispatcher

relayed those threats to the officers involved in the chase and reported as well that the suspect might be intoxicated. *See id.* The officers planned to stop the suspect by setting tire spikes at various locations on the interstate, but as the suspect headed towards the location where spikes were being set by another officer, Officer Mullenix decided it would be better to shoot at the suspect's car to disable it. *See id.* at 9. Mullenix took up a shooting position on an overpass, and when he spotted the suspect's approaching car, he fired six shots at the car, killing the suspect. *See id.*

The suspect's estate sued Mullenix individually under § 1983, alleging that he had used excessive force and violated the Fourth Amendment by shooting at the suspect's car. *See id.* at 10. Mullenix moved for summary judgment on the ground of qualified immunity, but the district court denied his motion and the Fifth Circuit affirmed, concluding that:

> Mullenix's actions were objectively unreasonable because several of the factors that had justified deadly force in previous cases were absent . . . : There were no innocent bystanders, [the suspect's] driving was relatively controlled, [Mullenix] had not first given the spike strips a chance to work, and [Mullenix's] decision was not a split-second judgment.

*Id.* at 11 (quotation marks omitted). The Fifth Circuit concluded further that Mullenix was not entitled to qualified immunity because "the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a

sufficiently substantial and immediate threat, violated the Fourth Amendment." *See id.* (quotation marks omitted).

The Supreme Court again granted certiorari and again reversed, this time bypassing the question whether Mullenix had violated the Fourth Amendment and focusing solely on the clearly established law prong of the analysis. *See id.* Addressing the Fifth Circuit's rationale for denying qualified immunity, the Court in *Mullenix* restated its oft-repeated admonition that clearly established law should not be defined "at a high level of generality" for purposes of qualified immunity. *See id.* at 12 (quotation marks omitted). The relevant inquiry, the Court explained, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *See id.* (quotation marks omitted). The Fifth Circuit had thus erred, the Court concluded, by holding that Mullenix violated the "clearly established rule" that an officer "may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *See id.* (quotation marks omitted). The determinative question was, instead, whether it was clearly established that the Fourth Amendment prohibited Mullenix's conduct "in the situation he confronted"—that is, whether it should have been clear to Mullenix that it violated the Fourth Amendment for him to shoot "a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer" who was setting a tire spike on the interstate. *See id.* at 13.

After reframing the relevant question in this manner, the Court ultimately concluded that no existing precedent at the time of the incident established "beyond debate" that Mullenix acted unreasonably by shooting at a suspect's car where the suspect "had led police on a 25–mile chase at extremely high speeds, was reportedly intoxicated, had twice threatened to shoot officers, and was racing towards [another] officer's location" on the interstate. *See id.* at 14–15. Surveying the relevant case law, the Court noted that its own precedent involving Fourth Amendment excessive force claims asserted in the context of high-speed car chases—at that point consisting solely of *Plumhoff*, *Scott*, and *Brosseau*—"reveal[ed] the hazy legal backdrop against which Mullenix acted." *See id.* at 14. In *Brosseau*, the Court noted, it had held that an officer <u>did not</u> violate clearly established law when she shot a suspect fleeing in his car out of fear that the suspect's flight endangered other officers and motorists in the area. *See id.* And in the two excessive force vehicular flight cases it had decided after *Brosseau*, the Court observed, it did not even find a Fourth Amendment violation where an officer used deadly force against a suspect during a high-speed car chase. *See id.* at 14–15 (citing *Scott v. Harris*, 550 U.S. 372, 384 (2007) and *Plumhoff*, 572 U.S. at 780). Indeed, the Court emphasized in *Mullenix*, it had "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *See id.* at 15.

Given the Supreme Court's decisions in *Plumhoff* and *Mullenix*, we likewise find no basis for denying qualified immunity to Defendant in this case. Again, in *Plumhoff*, issued just two years prior to Plaintiff's shooting, the Supreme Court held that an officer did not violate the Fourth Amendment by using deadly force to end the high-speed chase described in our discussion of that case above. There are a few differences between this case and *Plumhoff*: the suspect in *Plumhoff* was driving a car whereas Plaintiff was driving a motorcycle, the traffic in *Plumhoff* arguably was heavier, and the suspect in *Plumhoff* might have committed more traffic violations during the chase than Plaintiff. But there are many more similarities: (1) in this case and in *Plumhoff*, the initial stop was for a relatively minor offense[5]—a missing tag here and an inoperable headlight in *Plumhoff*; (2) in both cases, the initial stop

---

[5] Plaintiff's argument that his shooting was unreasonable because he initially was signaled to stop for a minor tag violation is unpersuasive, given that the suspect in *Plumhoff* was signaled to stop for a minor headlight violation. We note further that by the time Plaintiff was shot, he had committed numerous violations beyond a missing tag—indeed, when Plaintiff was shot, he was a fleeing felon under Georgia law. *See* O.C.G.A. § 40-6-395(b)(5)(A)(i) (making it a felony to drive in excess of 20 miles an hour above the posted speed limit "while fleeing or attempting to elude a pursuing police vehicle or police officer"). Of course, Plaintiff's status as a fleeing felon does not necessarily justify the use of deadly force against him. *See Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape."). But Plaintiff's suggestion that Defendant shot him because of a minor tag violation is an extreme mischaracterization of the record.

quickly developed into a protracted high-speed car chase; (3) like the suspect in *Plumhoff*, Plaintiff indisputably committed several traffic violations during the chase that Defendant reasonably could have perceived as posing a threat to other motorists, officers, and bystanders in the area, including running a red light in a downtown area, zigzagging and swerving around patrol cars, making U-turns and popping wheelies, and driving on the wrong side of the road; (4) it is undisputed that Defendant heard reports that Plaintiff was weaving through and heading into oncoming traffic, and thus endangering other motorists as the chase continued through Wayne County and thereby presenting a threat similar to that posed by the driver in *Plumhoff*; and (5) finally, like the officer in *Plumhoff*, Defendant shot Plaintiff when he threatened to take off and resume the chase after momentarily stopping.

In short, the Supreme Court in *Plumhoff* was faced with a scenario that is factually similar to this case in many respects. And presented with that factual scenario, the Supreme Court concluded that an officer's use of deadly force to terminate a high-speed car chase did not violate the Fourth Amendment because "all that a reasonable police officer could have concluded was that [the suspect] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Plumhoff*, 572 U.S. at 777. The same could be said here. But at the very least, it would not be clear to an officer in Defendant's position, and aware of *Plumhoff*, that the use of deadly force against Plaintiff as he restarted his motorcycle and threatened to

resume the lengthy and indisputably dangerous chase that preceded the shooting was unconstitutional.

As for *Mullenix*, it is more easily distinguished from this case than *Plumhoff*. Most notably, the suspect in *Mullenix* claimed to have a gun and threatened to shoot officers if they did not abandon their pursuit, and that threat was relayed to Officer Mullenix and presumably factored into his decision to disable the suspect's car by shooting at it. The suspect in *Mullenix* thus arguably presented a greater threat than Plaintiff to the officers involved in the chase, if not to other motorists and bystanders. On the other hand, the officers in *Mullenix* had a less lethal option of stopping the suspect—namely, the tire spikes that were being set at the time of the shooting. There is no evidence suggesting that the officers in this case had any less lethal means of stopping Plaintiff available to them, arguably making Defendant's decision to shoot at Plaintiff when he threatened to resume the chase more reasonable than Officer Mullenix's.

Nevertheless, and regardless of the factual differences between the two cases, the Supreme Court made a few points in *Mullenix* that are highly relevant to the qualified immunity analysis in this case, and that weigh heavily in favor of granting immunity to Defendant. First, we cannot (as Plaintiff would have us do) decide whether qualified immunity applies in this case by applying the clearly established but general rule—set out in *Graham* and *Garner*—that an officer may not use deadly force against a fleeing felon "absent a sufficiently substantial and immediate threat." *See*

26                    Opinion of the Court                    20-10503

*Mullenix*, 577 U.S. at 11.  The Supreme Court recently reaffirmed this principal in *Rivas-Villegas v. Cortesluna*, 595 U.S. __, 2021 WL 4822662, at *2 (U.S. Oct. 18, 2021) (quoting *Mullenix* and emphasizing that "[s]pecificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts") and *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. __, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality."). Instead, we must determine whether any preexisting law would have put Defendant on notice that his conduct under the particular circumstances that confronted him during the chase involving Plaintiff made it clear—"beyond debate"—that it would be unreasonable for him to use deadly force when Plaintiff threatened to resume the chase.[6]  *See Mullenix*, 577 U.S.  at 12.  Second, and as noted above, as of the date *Mullenix* was decided, the Supreme Court had "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment." *See id.* at 15.  The Supreme Court has not decided any excessive force cases involving a high-speed car chase since *Mullenix.*  It is thus

---

[6] Much of Plaintiff's argument on appeal is based on the general fleeing felon rule of *Garner* and *Graham*.  *Mullenix* makes it clear that the general rule of *Garner* and *Graham* does not apply in cases such as this one, where a suspect's vehicular flight reasonably—and objectively—could be perceived by an officer to pose a substantial risk to officers, other motorists, or pedestrians in the area.

apparent, based on *Mullenix*, that no Supreme Court authority could have put Defendant on notice that his use of deadly force against Plaintiff under the circumstances of this case violated the Fourth Amendment.

Nor would any preexisting precedent from this Court have put Defendant on notice of the unlawfulness of his conduct, assuming it was unlawful. Most of the circuit precedent Plaintiff cites is so factually dissimilar from this case that it has no bearing on the qualified immunity analysis. *See Gilmere v. City of Atlanta*, 774 F.2d 1495, 1502 (11th Cir. 1985) (finding a Fourth Amendment violation where officers beat and shot a drunk suspect during a scuffle that ensued after the suspect resisted arrest and attempted to flee on foot); *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987) ("[S]hooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was . . . an unreasonable seizure and clearly violated fourth amendment law.") (footnote omitted); and *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015) (denying qualified immunity to an officer who shot a suspect without warning after the suspect struggled with the officer and then backed away from the officer on foot).[7] These cases, all of which

---

[7] Plaintiff also cites *Ayers v. Harrison*, 650 F. App'x 709 (11th Cir. 2016), *Gaillard v. Commins*, 562 F. App'x 870 (11th Cir. 2014), and *Baltimore v. City of Albany*, 183 F. App'x 891 (11th Cir. 2006). Neither *Ayers* nor *Baltimore* involved a high-speed chase, and the chase in *Gaillard* had already ended when the defendant officer accelerated his vehicle into a suspect who was by that time fleeing on foot, killing him. *See Gaillard*, 562 F. App'x at 875 ("Importantly, this is not a case where a high-speed car chase remained in progress.

involved a suspect fleeing or resisting arrest while on foot, would not have given Defendant any reason to believe that his use of deadly force against Plaintiff was unreasonable given the events that occurred during the high-speed chase that preceded the shooting.

Plaintiff also relies on *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003), where this Court held it was unreasonable for an officer to shoot at a suspect who failed to pull his truck over when he was signaled by officers to stop, but who did not drive in a manner that posed a risk to the officers pursuing him or other motorists on the road. *See Vaughan*, 343 F.3d at 1330. *Vaughan* is easily distinguished from this case. All the suspect in *Vaughan* did before being shot was drive away from the police for a short distance down the interstate, traveling at approximately 80 to 85 miles per hour in a 70-mile per hour speed zone. *See id.* The suspect in *Vaughan* failed to stop when he was signaled by police to do so, but he made no evasive maneuvers besides accelerating and there was no evidence that he otherwise "had menaced or [was] likely to menace others" on the road "at the time of the shooting." *See id.* By contrast, it is undisputed that Plaintiff led numerous officers on

Instead, the suspect's vehicle spun off the road and came to a complete stop. An unarmed Gaillard then abandoned the vehicle and fled on foot."). But in any event, these unpublished cases do not constitute "clearly established" law for purposes of the qualified immunity analysis. *See JW, by and through Tammy Williams v. Birmingham Bd. of Ed.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018) ("Unpublished cases . . . do not serve as binding precedent . . . and cannot be relied upon to define clearly established law[.]").

a lengthy chase that reached speeds of 100 to 130 miles per hour, during which time Plaintiff swerved and zigzagged around patrol cars, ran a red light in a downtown area, and made U-turns and popped wheelies on Highway 341.  Furthermore, it had been reported to Defendant that Plaintiff was driving on the wrong side of the road, weaving through traffic, and heading into oncoming traffic as he continued the chase in Wayne County.[8]  Defendant would not have known, based on the very different facts in *Vaughan*, that his use of deadly force under the circumstances of this case clearly violated the Fourth Amendment.

In fact, this Court has "consistently upheld an officer's use of force and granted qualified immunity in cases where [a suspect] used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly

---

[8] We are not persuaded by Plaintiff's attempt to bring this case within the reasoning of *Vaughan* by citing his own testimony that he drove safely and that there was no other traffic on the road during the chase. Plaintiff's subjective assessment that he drove safely—albeit at speeds in excess of over 100 miles per hour and up to 130 miles per hour while performing evasive maneuvers to avoid the patrol cars pursuing him and running a red light in a downtown area—does not raise an issue of fact as to the objective risk Plaintiff presented from Defendant's perspective. *See Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015) (emphasizing that the objective reasonableness determination must be made "from the perspective and with the knowledge of the defendant officer").  And again, it is undisputed that Defendant heard credible reports that Plaintiff was weaving through and heading into oncoming traffic and thus endangering other motorists on the road as he continued the chase through Wayne County.

force." *See McCullough*, 559 F.3d at 1206–1207 (collecting Eleventh Circuit excessive force cases involving vehicular flight). In *McCullough*, officers shot and killed a suspect who "late at night refused to pull over, engaged in a high-speed chase, and then, after pulling over, repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward [an officer] standing nearby in a parking lot." *Id.* at 1208. Of course, we have assumed that Plaintiff did not drive his motorcycle directly toward Defendant, but Defendant might nevertheless have perceived Plaintiff to pose a serious threat to other motorists and bystanders if the chase continued, given the events that preceded the shooting. Several of our cases have held that it is reasonable for an officer to use deadly force to neutralize such a threat—even against a suspect who is not immediately threatening an officer by driving directly at the officer. *See Pace v. Capobianco*, 283 F.3d 1275, 1281–82 (11th Cir. 2002) (holding that the use of deadly force to terminate a high-speed chase was reasonable, even assuming the suspect did not try to run over or aim his car at the officers involved in the chase, due to the suspect's "aggressive use of his automobile during the chase"); *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (upholding an officer's use of deadly force against a mentally unstable suspect who stole a marked police car and was attempting to drive the car toward the road, stating: "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect"). A reasonable officer in Defendant's position would not have known to a certainty, based on these cases, that his use of deadly force against

Plaintiff violated the Fourth Amendment under the circumstances. *See Pace*, 283 F.3d at 1282 ("[P]re-existing law must give real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept.").

Finally, while it is true that factually identical precedent is not always required to overcome qualified immunity, we only dispense with the requirement in an excessive force case when an officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits" that its unlawfulness was "readily apparent" under the circumstances. *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (quotation marks omitted) (explaining that obvious clarity is a narrow exception to the rule requiring particularized case law, applicable where an officer's conduct extends "far beyond the hazy border between excessive and acceptable force"). *See also Helm v. Rainbow City*, 989 F.3d 1265, 1276 (11th Cir. 2021) (applying the obvious clarity rule where an officer "deployed his taser on a teenage girl three times as she lay immobilized on the floor with at least four to five adult men holding down her arms and legs while she suffered a medical emergency—a grand mal seizure"). The obvious clarity exception cannot apply here, given the Supreme Court's decision in *Plumhoff*, from which an officer in Defendant's position might reasonably have extrapolated that the use of deadly force to terminate a protracted high-speed chase, during which Plaintiff committed numerous traffic violations while driving at speeds of 100 to 130 miles per

hour through two counties was a reasonable response to the threat presented by allowing Plaintiff to resume the chase.  As such, and because Plaintiff fails to point to any other preexisting law that would have given Defendant fair warning of the unlawfulness of his conduct, we hold that Defendant is entitled to qualified immunity on Plaintiff's § 1983 Fourth Amendment claim.

III.    State Claims

The district court did not rule on the merits of Plaintiff's state claims.  Instead, the court declined pendent jurisdiction over the those claims and dismissed them without prejudice after granting summary judgment on the federal § 1983 claim.  The district court was within its discretion to decline jurisdiction over Plaintiff's state claims, and there is no basis for disturbing that decision on appeal. *See Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1550 (11th Cir. 1992) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.") (quotation marks omitted); *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015) (citing 28 U.S.C. § 1367(c) and noting the district court's authority to dismiss state claims once the court "has dismissed all claims over which it has original jurisdiction").

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's order granting summary judgment to Defendant on Plaintiff's

20-10503              Opinion of the Court                       33

§ 1983 claim on the ground of qualified immunity and dismissing without prejudice Plaintiff's state claims.

20-10503                JORDAN, J., Concurring                1

JORDAN, Circuit Judge, Concurring:

Given the Supreme Court's recent qualified immunity decisions in *Rivas-Villegas v. Cortesluna*, 595 U.S. ___, 2021 WL 4822662 (U.S. Oct. 18, 2021), and *City of Tahlequa v. Bond*, 595 U.S. ___, 2021 WL 4822664 (U.S. Oct. 18, 2021), I reluctantly concur in the judgment. I say reluctantly because the Supreme Court's governing (and judicially-created) qualified immunity jurisprudence is far removed from the principles existing in the early 1870s, when Congress enacted 42 U.S.C. § 1983. *See, e.g., Zigler v. Abasi*, 137 S.Ct. 1843, 1870-72 (2017) (Thomas, J., concurring in part and concurring in the judgment); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 55-61 (2018); Ilan Wurman, *Qualified Immunity and Statutory Interpretation*, 37 Seattle U. L. Rev. 939, 961-72 (2014).  For a Court that consistently tells us that federal statutes are interpreted according to ordinary public meaning and understanding at the time of enactment, *see Wisconsin Central Ltd. v. United States*, 138 S.Ct. 2067, 2071 (2018), and that § 1983 preserved common-law immunities existing at the time of its enactment, *see Pierson v. Ray*, 386 U.S. 547, 554-55 (1967), that is a regrettable state of affairs.

Viewing the evidence in light most favorable to Mr. Schantz, Sheriff DeLoach used deadly force against him twice.  Sheriff DeLoach first fired his shotgun at Mr. Schantz when he had stopped his motorcycle.  When that first blast missed and Mr. Schantz understandably tried to drive away, Sheriff DeLoach fired at him again. This time the shot hit home, with the buckshot striking Mr.

Schantz in the face and neck.  The notion that Sheriff DeLoach can escape liability for using deadly force under these circumstances—against an unarmed joyrider who was at rest on his motorcycle—stands § 1983 on its head, and will lessen incentives for police departments to craft better policies for the use of deadly force.  "Regardless of the formal relationship between the constitutional and state law standards and the administrative standard, it is clear that the administrative standard remains heavily informed by both." Seth W. Stoughton, Jeffrey J. Noble, & Geoffrey P. Alpert, Evaluating Police Uses of Force 104 (2020). *See also* Franklin E. Zimring, When Police Kill 219 (2017) ("[T]he main arena for the radical changes necessary to save many hundreds of civilian lives in the United States each year is the local police department, not the federal courts or Congress, not state government, not local mayors or city councils, not even the hearts and minds of the police officers on the streets.  All of these people and institutions can help by influencing local police to create less destructive rules of engagement.").