**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-12307

————————————————

JAFET CASTRO-REYES,

*Plaintiff-Appellee,*

*versus*

CITY OF OPA-LOCKA,

*Defendant,*

GERMAN BOSQUE,
LUIS SERRANO,
SERGIO PEREZ,
DANIEL KELLY,
   City of Opa-Locka Police Department
   Opa-Locka, FL,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-21397-KMW

_____

Before HULL, MARCUS, and WILSON, Circuit Judges.

HULL, Circuit Judge:

Plaintiff-Appellee Jafet Castro-Reyes experienced an episode of erratic behavior at his apartment in Opa-Locka, Florida. During that episode, Castro-Reyes's friend and family members became so concerned with his behavior that they tied Castro-Reyes up at his hands and feet using electrical wires and clothing cords. They called 911, and police responded and detained Castro-Reyes under Florida's Baker Act, Fla. Stat. §§ 399.451, 394.463(1).

While attempting to handcuff Castro-Reyes, a struggle allegedly ensued, and the officers tased, punched, and dragged him. After his release from the hospital, Castro-Reyes brought this action against the City of Opa-Locka and Defendant-Appellant Officers German Bosque, Daniel Kelly, Luis Serrano, and Sergio Perez individually. His complaint raised multiple claims under 42 U.S.C. § 1983 and Florida law.

The Officers moved for summary judgment on qualified immunity and state agent immunity grounds, which the district court granted in part and denied in part. The district court allowed these claims, *inter alia*, to proceed to trial: (1) a false arrest claim brought under § 1983 against Officers Bosque and Kelly; (2) an excessive force claim brought under § 1983 against Officers Serrano

and Perez; and (3) an assault and battery claim under Florida law against Officers Serrano and Perez. This is the Officers' appeal.

After careful review, and with the benefit of oral argument, we (1) reverse the district court's denial of qualified immunity to Officers Bosque and Kelly as to the false arrest claim under § 1983; (2) affirm the district court's denial of qualified immunity to Officers Serrano and Perez as to the excessive force claim under § 1983; (3) affirm the district court's denial of state agent immunity to Officers Serrano and Perez as to the assault and battery claim under Florida law; and (4) remand for further proceedings consistent with this opinion.

## I. FACTS

### A. Body Camera Videos

In addition to affidavits and deposition testimony, the parties filed body camera videos from multiple officers as evidence. We accept these videos' depictions to the extent they are clear or obviously contradict Castro-Reyes's or his witnesses' version of events.[1] *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (concluding that because one party's account was "blatantly contradicted" by video evidence, "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"); *Shaw v. City of Selma*, 884 F.3d 1093,

---

[1] At deposition, Castro-Reyes testified he could not recall any of the events at issue. The record, however, contains affidavits and deposition testimony from Castro-Reyes's friend and family members who were present that day.

1098 (11th Cir. 2018) ("Where a video in evidence obviously contradicts the nonmovant's version of the facts, we accept the video's depiction instead of the nonmovant's account . . . ." (citation modified)).

Here though, at key moments the body camera videos fail to provide an unobstructed view of the events, or are blurry, or omit Castro-Reyes from the frame, or are otherwise indiscernible. The videos thus contain ambiguities, which we must construe in favor of Castro-Reyes. *See Baker v. City of Madison*, 67 F.4th 1268, 1277 (11th Cir. 2023) (explaining that, at the motion-to-dismiss stage, "courts must construe all ambiguities in the video footage in favor of the plaintiff"); *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021) ("Where no video exists or where the videos do not answer all the questions or resolve all the details of the encounter, we view the evidence in the light most favorable to [the non-moving party]." (citing *Cantu v. City of Dothan*, 974 F.3d 1217, 1226-27 (11th Cir. 2020))); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017) (noting that at the summary judgment stage, "[w]e resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts" (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003))); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam) (noting the silent video from a closed circuit security camera is "not obviously contradictory because it fails to convey spoken words or tone and because it sometimes fails to provide an unobstructed view of the events").

Applying these standards, we recount the facts in the light most favorable to Castro-Reyes.

## B.    Events Prior to the Arrival of Law Enforcement

Nineteen-year-old Castro-Reyes lived in an apartment by himself in Opa-Locka, Florida.  On the morning of September 21, 2020, Castro-Reyes told his cousin who lived next door, Pamela Betancourth, that he wanted to move and begin a new life. Castro-Reyes began clearing items like food from the fridge and pieces of furniture from his apartment.

Later that same day, Misael Perez, Castro-Reyes's childhood friend who lived nearby, observed Castro-Reyes behaving "a bit hyperactive[ly]."  This behavior included Castro-Reyes: (1) moving his apartment furniture outside because he was trying to "cleanse his life," and (2) hyperventilating upon Misael Perez's arrival to Castro-Reyes's apartment.  Concerned, Misael Perez called Castro-Reyes's cousin Jose Varela, aunt Rina Ayala, and cousin Betancourth to check on him.  Around the same time, Castro-Reyes also unsuccessfully called his cousin Varela multiple times.

Between 1:00 p.m. and 3:00 p.m., cousin Varela and aunt Ayala arrived.  Varela observed Castro-Reyes crying, walking around the living room, and saying he felt bad.  Castro-Reyes told his family members that he wanted to leave, but Ayala and Varela stood in front of the door to stop him from exiting the apartment. Castro-Reyes was not aggressive towards his family at any point, but he asked them to move aside.  His family believed

Castro-Reyes was "not well" and "unrecognizable," and Varela and Ayala continued to block the door out of concern for his safety. Misael Perez, Varela, and Ayala decided to tie Castro-Reyes's hands and feet with electrical wires and clothing cords to prevent him from leaving the apartment.

After observing Castro-Reyes's behavior, the family decided to call 911. Varela and Ayala hoped that fire rescue or an ambulance would come to help Castro-Reyes. Varela asked Betancourth, who was not in the apartment, to make the call. Betancourth (1) called 911; (2) asked for police assistance; (3) stated that she was unsure as to whether Castro-Reyes had smoked marijuana; and (4) told the dispatcher that Castro-Reyes was acting strangely, but was not violent.

## C.    Initial Response (Officers Bosque and Kelly)

On September 21, 2020, at approximately 3:40 p.m., Officers German Bosque and Daniel Kelly responded to a dispatch concerning a "234 domestic" disturbance at Castro-Reyes's residence. Dispatch advised that the subject—a potentially violent male—was "possibly high on 52."[2] As Bosque later testified, the dispatch "went out as a violent family member."

Officers Bosque and Kelly arrived by 3:44 p.m. and were met outside the apartment by Varela, who was standing near the entrance. Varela informed the Officers that he had tied up his

---

[2] "Fifty-two" is the Opa-Locka Police Department's code for a narcotics investigation.

cousin.  Upon hearing this, Bosque advised over the radio, "Hold the air a second. They're advising me somebody's tied up inside."

As the Officers and Varela walked toward the apartment, Varela explained that his cousin never acts like this, and that the family did not know what was wrong with Castro-Reyes. According to Varela, (1) Castro-Reyes had begun damaging his own apartment, and Varela's brother had contacted him about it; (2) Varela's mother and sisters were inside Castro-Reyes's apartment; and (3) Castro-Reyes proclaimed that he was "God."

Officers Bosque and Kelly reached Castro-Reyes's open front door and entered the apartment.  Castro-Reyes lay on the tile floor of the apartment with his pants around his ankles and his hands, legs, and ankles bound by electrical wires and clothing cords.  It was raining that day, and Castro-Reyes and the apartment floor were completely wet.  Indeed, the other individuals present were also wet.

As soon as Officers Bosque and Kelly stepped inside, Castro-Reyes told them to leave his apartment and informed them that they did not have permission to be inside his home.  Bosque and Kelly did not retreat and continued their conversation with Castro-Reyes.

Bosque ordered that Castro-Reyes be handcuffed. Castro-Reyes asked Bosque to free him from the wires and cords, to which Bosque responded he would not release him and that Castro-Reyes needed to roll over because Bosque was going to

handcuff him.  Castro-Reyes was not told he was being arrested for a crime or detained pursuant to Florida's Baker Act.[3]

Varela informed Bosque that Castro-Reyes was not aggressive and not dangerous.  Bosque ordered Varela to untie Castro-Reyes.  Castro-Reyes remained calm while Varela attempted to untie his hands.[4]

At 3:45 p.m., Bosque made another announcement for dispatch to "Hold the air a second until we untie him and secure him."  When Bosque asked his name, Castro-Reyes responded, "I am God" in Spanish but continued to lie unmoving on the floor. At this point, approximately ninety seconds after first making contact with Castro-Reyes, Bosque declared the situation to be a "43" (Baker Act event) as Castro-Reyes prayed in the background.

Meanwhile, Varela successfully untied Castro-Reyes's right arm, and Kelly placed a handcuff around that wrist.  Bosque and Kelly then instructed that Castro-Reyes be "flipped over" into the prone position so that Castro-Reyes could be handcuffed behind his back.  After several failed attempts at flipping Castro-Reyes, Bosque called for backup.  When relaying that request, the dispatcher advised that the subject was a "violent male."

---

[3] Florida's Baker Act, *inter alia*, provides for the involuntary detention of individuals for mental health evaluations when certain criteria are met.  *See* Fla. Stat. §§ 399.451, 394.463(1).

[4] Bosque testified that at no point during law enforcement's attempts to take Castro-Reyes into custody did Castro-Reyes ever attempt to strike any officer.

As they waited for backup, a visibly upset Varela continued trying to flip the still partially-bound Castro-Reyes over into the prone position on the wet tile floor as Castro-Reyes repeatedly demanded to be released "in the name of God." Bosque held on to Castro-Reyes's unhandcuffed left hand, which was partially bound by a cord. Castro-Reyes's feet and ankles, however, were still completely bound as he lay on the floor.

Unable to turn Castro-Reyes over into the prone position on the slippery floor, and about five minutes after the officers originally arrived, cousin Varela put Castro-Reyes in a quasi-headlock to protect Castro-Reyes from a perceived, forthcoming police action.[5] Castro-Reyes continued pleading to be let go and left alone.

### D.    Backup Arrives (Officers Serrano and Perez)

#### 1.    Officer Luis Serrano

At approximately 3:48 p.m., Officer Luis Serrano and two other officers arrived on scene. Castro-Reyes was no longer in a quasi-headlock. Upon entry, Serrano asked, "Who's the subject," as the arriving officers grabbed Varela. Realizing that the arriving officers mistakenly thought Varela was the subject, Bosque exclaimed, "No. No. No. No . . . He's helping . . . He's helping,"

---

[5] Varela later testified at his deposition that, due to a similar incident in the community, the call for backup officers made him worried that Castro-Reyes was going to be beaten by the police. So, Varela put Castro-Reyes in the quasi-headlock to "protect him."

and as to Castro-Reyes, "[h]e's a 43." A "43" is the Opa-Locka Police Department code for "[a] mentally ill person or person in need of a psychiatric evaluation [under the Baker Act]." Bosque and Kelly told the newly arriving officers that Castro-Reyes was "overpowering" them, and that they were trying to flip Castro-Reyes to place handcuffs on him.

When Serrano and the backup officers arrived, (1) Kelly had Castro-Reyes's right wrist in a handcuff and Bosque was holding firm on Castro-Reyes's left wrist; and (2) Castro-Reyes was on his back, with his hands clasped in front of his chest and feet fully tied up. Shortly thereafter, an unnamed backup officer attempted to lift Castro-Reyes by his clasped hands, but was unable to do so and dropped Castro-Reyes on the floor.

A chaotic scene then unfolded as multiple officers grabbed Castro-Reyes, pulling his body in various directions and shouting at him to turn over. A few seconds later, Officer Serrano tased Castro-Reyes. This first tasering lasted for about sixteen seconds. As the taser connected with his skin, Castro-Reyes spasmed and curled into the fetal position.

At this juncture, the available footage becomes blurry and leaves Castro-Reyes out of frame for significant portions of time. Serrano's repeated tasing continued and can be heard on video. Serrano's report later revealed that he deployed his taser approximately twenty-two times, doing so three to five times within the first thirty seconds of deployment.

2.    Officer Sergio Perez

Then-Lieutenant Sergio Perez arrived around the same time as Serrano and became the commanding officer at the scene. Within a minute of arrival, Perez (like Serrano) was informed before he deployed any force on Castro-Reyes that Castro-Reyes was a "43" (mentally ill person). Although Perez was informed that Varela was helping law enforcement, Perez and another officer physically moved Varela away from Castro-Reyes. Castro-Reyes was still tied up at his feet and ankles, wearing his pants around his ankles.

Significantly, Perez testified that Castro-Reyes never kicked or struck officers, and testimony of the family members characterizes Castro-Reyes as not violent towards them or the officers.

When the available footage refocuses, multiple officers are atop Castro-Reyes and struggling to handcuff Castro-Reyes. While one officer pressed Castro-Reyes's face into the ground and others pinned his body down, Perez punched Castro-Reyes in the face three times with a closed fist. When Bosque told Perez not to punch Castro-Reyes in the face, Perez responded, "Don't fucking tell me don't do it," to which Perez was again reminded that Castro-Reyes was considered a mentally ill person:

> **Bosque**: Don't do it.  Don't do it.  That's not gonna help.
>
> **Perez**: What do you mean don't fucking do it?
>
> **Bosque**: OK. It's not going to help.

**Perez**: He's resisting.

**Bosque**: I know, but he doesn't know it.  He's a 43 [mentally ill person].

**Perez**: Don't fucking tell me don't do it.  Turn around.

**Bosque**: He's a 43[, Lieutenant].

Perez testified that his hand was being pinned by Castro-Reyes when he punched Castro-Reyes.

In November 2022, the Opa-Locka Police Department relieved Perez from duty.  Perez was ultimately charged with battery against Castro-Reyes in connection with this incident.  At oral argument, Perez's counsel represented that Perez was "acquitted" of that charge.

### E.    Officers Remove Castro-Reyes from the Apartment

While standing across the room from Castro-Reyes and the officers trying to handcuff Castro-Reyes, Bosque suggested Perez move "everybody outside."  At 3:53 p.m., Perez walked over to Castro-Reyes, grabbed him by the ankles, and dragged Castro-Reyes on his back across the floor while saying, "let's get him outside, it's slippery."  Once Perez and Castro-Reyes reached the door frame, Kelly exclaimed from across the room: "Not his head, not his head, not his head!"

Then, Castro-Reyes extended both of his arms and grabbed the door frame, but Perez pulled him through it.  Castro-Reyes's head hit the edge of the concrete step, but then he immediately

pulled himself back up to the door frame with his arms. An unidentified officer (presumably Serrano) deployed a taser on Castro-Reyes, who then let go of the door frame. Perez dragged Castro-Reyes down two concrete steps with Castro-Reyes appearing to hit his head on both steps.

The struggle continued at the bottom of the steps in the rain. Serrano again used his taser while other officers tried to handcuff Castro-Reyes on the ground, prompting Perez to look directly at Serrano and say: "No more taser, Serrano. That's an order."

Within seconds, a standing Serrano said, "watch out, I need a clear shot," and took a step back from the group of officers surrounding Castro-Reyes on the ground. As an officer in the group said, "I got an arm right here," Serrano stepped closer, leaned down, and inserted his taser in an opening between two officers, as he stood behind them, to make direct contact with Castro-Reyes and activated his taser. This prompted an officer to ask, "Who's tasing?" with no reply audibly given.

Serrano observed the group of officers still working to handcuff Castro-Reyes for a few seconds, then walked back to his patrol car. Bosque successfully handcuffed Castro-Reyes at around 3:55 p.m. Serrano (1) retrieved a restraint from his patrol car, (2) walked back to the apartment steps, (3) remarked with laughter that his taser battery was drained, and (4) replaced the restraints at (the now-handcuffed) Castro-Reyes's legs and ankles.

In his deposition, Officer Kelly testified it was at this time that Perez ordered him to arrest Castro-Reyes. Kelly, however,

refused to make the arrest due to Castro-Reyes's mental state, asking, "what was he going to be arrested for?" Kelly said he and Officer Bosque had determined that (1) Castro-Reyes was having a "mental breakdown," (2) "he needed psychiatric help," and (3) that "jail would not be the best place for [Castro-Reyes]." Perez allegedly threatened Kelly, saying that "if [Kelly] did not make the arrest, [Perez] got something coming for [Kelly] on the back end." Kelly still refused to make the arrest and called the on-call State Attorney the following day, who advised him that "if [he was] not comfortable with making th[e] arrest, [he did] not have to make the arrest."

Eventually, Fire and Rescue transported Castro-Reyes to Jackson Memorial Hospital. Officer Kelly went to the hospital following the incident. Dr. Jonathan Brandon told Kelly that he was going to involuntarily commit Castro-Reyes, *i.e.*, "Baker Act" him, to perform a psychological evaluation. However, other than Castro-Reyes's medical bills, there are no records of his hospital stay showing that he was in fact committed pursuant to Florida's Baker Act. Castro-Reyes remained at Jackson four nights until September 25, 2020.

As a result of this incident, Castro-Reyes states that he suffered a dislocated right shoulder, back pain, lacerations to his face, and kidney issues associated with his injuries. No criminal charges were filed against Castro-Reyes.

## II.  PROCEDURAL HISTORY

In May 2022, Castro-Reyes filed this civil rights action alleging multiple violations of federal and state law.  In his amended complaint, he brought Counts I-III under 42 U.S.C. § 1983.  Count I alleged that each officer's warrantless entry into his home violated the Fourth Amendment, asserting there was neither consent nor exigent circumstances.  Count II challenged the lawfulness of Castro-Reyes's seizure, asserting that the officers lacked probable cause and committed a false arrest.  Count III presented an excessive force claim, which alleged in part that punching and tasing Castro-Reyes to effectuate his seizure was clearly excessive.  Counts IV and V raised state law claims of false imprisonment, battery, and assault.

All four appellants—Officers Bosque, Kelly, Perez, and Serrano—were named in Counts I-V.  Castro-Reyes brought similar claims, along with a negligent training and supervision claim, against the City of Opa-Locka in Counts VI-IX.

After discovery, the parties filed cross-motions for summary judgment.  In part, the officers argued that (1) qualified immunity shielded them from Castro-Reyes's claims brought under § 1983, and (2) state agent immunity under Florida statutory law shielded them from Castro-Reyes's claims brought under Florida law.

The district court issued an omnibus order ruling on the motions.  As to Officers Bosque and Kelly, the district court granted summary judgment on Counts I and III-V and denied summary judgment for the false arrest claim (Count II).  The district court

granted Perez and Serrano summary judgment on Counts I-II and V, but denied summary judgment on the excessive force claim (Count III) and the state-law battery and assault claim (Count IV). The district court further declined to grant Castro-Reyes's motion for summary judgment on any issue, including on the issue of whether the officers were acting under color of law. Finally, the district court granted in part and denied in part the City of Opa-Locka's motion for summary judgment.

The officers timely appealed.

### III. JURISDICTION

Castro-Reyes did not cross-appeal, and instead, challenges our jurisdiction over the officers' appeal. Because "[w]e have a threshold obligation to ensure that we have jurisdiction to hear an appeal," *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1227 (11th Cir. 2020), we address this issue first and reject Castro-Reyes's jurisdictional challenge.

Under 28 U.S.C. § 1291, this Court has jurisdiction over appeals only from "final decisions" of the district courts. A district court's denial of summary judgment is generally not a final appealable order under 28 U.S.C. § 1291. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). However, the Supreme Court has held "that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

This Circuit has clarified that "[w]hether we have interlocutory jurisdiction to review the denial of summary judgment on qualified immunity grounds depends on the type of issues involved in the appeal." *Cottrell v. Caldwell*, 85 F.3d 1480, 1484 (11th Cir. 1996) (emphasis omitted). That is, "where the only issues appealed are evidentiary sufficiency issues" and no issues of law are raised, this Court lacks jurisdiction over the appeal. *Id.* Qualified immunity analyses often involve both questions of evidentiary sufficiency and questions of law. As a result, it can sometimes be difficult to discern between purely fact-bound questions and legal determinations. *See English v. City of Gainesville*, 75 F.4th 1151, 1156 (11th Cir. 2023) (explaining that appellants may "cast their arguments as legal disputes" when the appeal actually raises only questions of fact).

Even so, our precedent is clear that we have jurisdiction when there are mixed questions of law and fact in an interlocutory appeal of the denial of summary judgment on qualified immunity grounds. *See Hall v. Flournoy*, 975 F.3d 1269, 1276 (11th Cir. 2020) ("To be sure, the presence of a factual dispute on appeal does not automatically foreclose interlocutory review; rather, jurisdictional issues arise when the *only* question before an appellate court is one of pure fact."); *Koch v. Rugg*, 221 F.3d 1283, 1295-96 (11th Cir. 2000) ("When *both* core qualified immunity issues are involved, we have jurisdiction for *de novo* review"). And these same principles apply to interlocutory appeals involving state agent immunity under Florida law. *See Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1324 (11th Cir. 2022) ("Because the district court's order denied the

18                    Opinion of the Court                    24-12307

officers immunity under [Fla. Stat.] § 768.28(9)(a), it is immediately appealable.").

In the present case, while the parties dispute what the available body camera footage shows, (1) Bosque and Kelly also challenge the district court's conclusion that they did not have arguable probable cause under Florida's Baker Act; (2) Serrano and Perez also challenge the district court's legal analysis regarding the alleged use of excessive force; and (3) Serrano and Perez also challenge the district court's conclusion that state agent immunity does not shield them from Castro-Reyes's assault and battery claims under Florida law.  It is these mixed questions of law and fact that plainly give us jurisdiction over this matter.  *See Hall*, 975 F.3d at 1276.

## IV.  SECTION 1983 CLAIMS

As to Castro-Reyes's § 1983 claims, this appeal involves the district court's denial of qualified immunity on his (1) false arrest claims against Officers Bosque and Kelly and (2) excessive force claims against Officers Serrano and Perez.

### A.    Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Where a defendant officer was operating within the scope of his

discretionary authority, the plaintiff bears the burden of "demonstrat[ing] that qualified immunity is not appropriate." *Gray ex rel. Alexander*, 458 F.3d at 1303 (quoting *Lumley v. City of Dade City*, 327 F.3d 1186, 1194 (11th Cir. 2003)).

It is undisputed that defendant officers were acting within the scope of their discretionary authority. Accordingly, Castro-Reyes bears the burden of demonstrating "both (1) that the officers 'violated a statutory or constitutional right' and (2) 'that the right was clearly established at the time of the challenged conduct.'" *Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1239 (11th Cir. 2024) (quoting *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017)); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). We address each claim in turn.

## B.    False Arrest Claims Against Officers Bosque and Kelly

Because probable cause is a complete bar to § 1983 claims for false arrest, Officers Bosque and Kelly are entitled to qualified immunity if the undisputed facts show that they had arguable probable cause to detain Castro-Reyes under the Baker Act. *See Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021). "Arguable probable cause exist[ed] if a reasonable officer, knowing the information [Bosque and Kelly] possessed, could have believed that probable cause existed to involuntarily commit [Castro-Reyes]." *See id.* When making that assessment, this Court "look[s] to the totality of the circumstances." *Id.*

To involuntarily commit someone for a mental health examination under Florida's Baker Act, an officer must have

"reason to believe that the person has a mental illness and because of [their] mental illness": (1) "has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination," *or* "is unable to determine for [themselves] whether examination is necessary"; and (2) "[w]ithout care or treatment, the person is likely to suffer from neglect or refuse to care for" themselves *or* "[t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to [themselves] or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1) (2020).

As to the "neglect or refusal" prong, (1) a person's neglect or refusal of care must "pose[] a real and present threat of substantial harm to [their] well-being," and (2) it must not be "apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services." *Id.* § 394.463(1)(b)1 (2020).

Put differently, the Baker Act establishes conjunctive requirements to support a peace officer's decision to initiate an involuntary detention. The officer must have "reason to believe both that a person has a mental illness and that the mental illness has led to other statutory criteria." *K.M. v. State*, 359 So. 3d 414, 419 (Fla. Dist. Ct. App. 2023). Florida courts have explained the "other statutory criteria":

> The other statutory criteria also have two requirements, both of which can be met in alternative ways: (1)(a)1 refusal of voluntary examination or (1)(a)2 inability to determine for himself whether

examination is necessary and (1)(b)1 likelihood of neglect with real and present threat of harm to his wellbeing that cannot be avoided with other services or (1)(b)2 substantial likelihood of serious bodily harm to himself in the near future based on recent behavior.

*Id.*

In consideration of this framework, we are mindful that: (1) "Florida courts require more than erratic behavior or knowledge that a person is suffering from a mental illness"; and (2) "[v]ague notions about what a person might do—for example, a belief about *some* likelihood that without treatment a person *might* cause *some* type of harm at *some* point—does not meet this standard." *Khoury*, 4 F.4th at 1126, 1128 n.7 (citing Florida case law).

Nonetheless, crediting Castro-Reyes's own evidence, the undisputed portions of the dispatch information and on-scene observations provided Officers Bosque and Kelly with particularized facts supporting their belief that Castro-Reyes: (1) had a mental illness; (2) could not determine for himself whether examination was necessary; and (3) posed a danger to himself and potentially to others. These three beliefs established arguable probable cause to detain Castro-Reyes under the Baker Act.

We reach this conclusion recognizing the temporal limitations placed upon the facts that we may consider. Specifically, Florida courts have explained "that behavior that

occurred after the initiation of the involuntary commitment for treatment cannot form the justification for that same involuntary commitment." *J.W. v. State*, 313 So. 3d 909, 912 (Fla. Dist. Ct. App. 2021). In other words, arguable probable cause to detain Castro-Reyes under the Baker Act cannot be premised on his behavior after the detaining officer has initiated the detention. *See id.*

The parties dispute at what point Castro-Reyes's involuntary detention began under the Baker Act. Castro-Reyes contends that Officer Bosque initiated the involuntary detention within ten seconds of Officers Bosque and Kelly entering the home, when Bosque told Kelly to handcuff Castro-Reyes. Bosque and Kelly, on the other hand, imply that the involuntary detention did not begin until after Bosque officially stated the situation was "a forty-three." Because the knowledge Bosque and Kelly possessed when Bosque first ordered Castro-Reyes be handcuffed provided arguable probable cause to detain him under the Baker Act, we need not, and do not, resolve this dispute.

We explicate our conclusions by addressing each statutory criterion for involuntary detention under the Baker Act in turn.

1.    Mental Illness

The undisputed record provides ample support that Officers Bosque and Kelly could have reasonably concluded Castro-Reyes had a mental illness. First, Bosque heard dispatch report a "234 domestic" disturbance. Second, when Bosque and Kelly arrived, cousin Varela was visibly distraught and immediately told them

that he had tied Castro-Reyes up.  Varela also told Bosque and Kelly that Castro-Reyes was (1) acting strangely, (2) tearing up his apartment, and (3) proclaiming he was "God."   Third, upon entering the apartment, Bosque and Kelly were met with the following scene: Castro-Reyes (1) on the ground, (2) surrounded by visibly upset family members, (3) covered in water, (4) tied up, (5) with pants around his ankles, and (6) no furniture in his apartment.

Considering this evidence alone—which existed before Bosque's initial command to handcuff Castro-Reyes—an officer in Bosque and Kelly's situation could reasonably conclude Castro-Reyes was mentally ill.

2.    Consenting to Examination

The next criterion requires either that (a) the "person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination" or (b) the "person is unable to determine for [themselves] whether examination is necessary."  Fla. Stat. § 394.463(1)(a) (2020).  "An opportunity to refuse voluntary examination is thus unnecessary if the subject is unable to determine for himself or herself whether examination is necessary."  *Teel v. Lozada*, 99 F.4th 1273, 1286 (11th Cir. 2024) (internal quotation marks omitted).

Here, Officers Bosque and Kelly did not explain and disclose the purpose of an examination.  For Bosque and Kelly to succeed at this stage, Castro-Reyes must have been "unable to determine

for himself" that examination was necessary.  *See* Fla. Stat.
§ 394.463(1)(a) (2020).

For the same reasons explained above, the undisputed
evidence in the record demonstrates that Castro-Reyes could not
determine for himself whether such an examination was necessary.
To wit, (1) Varela told Bosque and Kelly that Castro-Reyes was
tearing up his apartment and saying that he was God;
(2) Castro-Reyes immediately told the police that he did not want
them near him; and (3) family members used improvised restraints
to prevent Castro-Reyes from leaving.  Thus, a reasonable officer
could conclude the family members restrained Castro-Reyes
because they feared for his safety and believed he was not able to
care for himself.

### 3.    Danger to Himself or Others

The final criterion is met if: (a) without care or treatment,
Castro-Reyes was likely to suffer from neglect or refuse to care for
himself, posing a real and present threat of substantial harm to his
well-being that appeared unavoidable through the help of family
members, friends, or other services; *or* (b) there was a substantial
likelihood that without care or treatment Castro-Reyes would
cause serious bodily harm to himself or others in the near future,
as evidenced by recent behavior.  *See* Fla. Stat. § 394.463(1) (2020).

Once again, for the reasons described above, there is
sufficient evidence that a reasonable officer with Bosque and
Kelly's knowledge could find that Castro-Reyes met this criterion.
Even before Bosque's initial order to handcuff Castro-Reyes, the

24-12307              Opinion of the Court              25

combination of self-destructive behavior, disorientation, and impaired judgment exhibited by Castro-Reyes could lead a reasonable officer to conclude that Castro-Reyes posed an immediate risk to his own safety or the safety of others.[6]

Given the totality of the circumstances, we easily conclude that Officers Bosque and Kelly had arguable probable cause to detain Castro-Reyes under the Baker Act and are entitled to qualified immunity on this claim. We thus reverse the district court's denial of qualified immunity to Bosque and Kelly on Castro-Reyes's § 1983 false arrest claim.

## C.   Excessive Force Claims Against Officers Serrano and Perez

To overcome Officers Perez's and Serrano's assertions of qualified immunity on his excessive force claims, Castro-Reyes has the burden to show that their use of force violated his Fourth Amendment rights and that those rights were clearly established at the time of the conduct. *See Acosta*, 97 F.4th at 1239; *Ashcroft*, 563 U.S. at 735. We conclude that Castro-Reyes does so on both counts.

---

[6] Although not the focus of the parties' briefing, this same evidence could arguably lead a reasonable officer to conclude that: (1) without care or treatment, Castro-Reyes was likely to suffer from neglect or refuse to care for himself; (2) this posed a real and present threat of substantial harm to Castro-Reyes's well-being; and (3) the threat of substantial harm appeared unavoidable through the help of family members, friends, or other services.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). Even when an officer has probable cause to arrest or detain an individual, the individual may still pursue a § 1983 excessive force claim if the force used to effectuate that arrest or detention was objectively unreasonable. *See Hardigree v. Lofton*, 992 F.3d 1216, 1231 n.7 (11th Cir. 2021) (noting that an excessive force claim is not subsumed by an unlawful arrest claim because a plaintiff may argue that, even assuming probable cause existed, the force used was nevertheless unconstitutional). When analyzing whether the force used was reasonable, this Circuit again looks to the "totality of circumstances." *See Barnes v. Felix*, 605 U.S. 73, 76 (2025) (quoting *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).

Guided by the factors outlined in *Graham v. Connor*, this Circuit assesses whether the use of force is "objectively reasonable" by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (citing *Graham*, 490 U.S. at 396). The quantum of force employed against an individual is weighed against (1) "the severity of the crime at issue"; (2) "whether the suspect posed an immediate threat to the safety of the officers or others"; (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight; (4) "the need for the application of force"; (5) "the

relationship between the need and amount of force used"; and (6) "the extent of the injury inflicted." *Acosta*, 97 F.4th at 1239 (citation modified).

In undertaking the requisite balancing, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. This must be decided "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Zivojinovich v. Barner*, 525 F.3d 1059, 1072 (11th Cir. 2008) (per curiam) (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

In this appeal, we perform our excessive force analysis with the benefit of body camera videos from multiple officers. The parties hotly dispute what those videos show: Officers Perez and Serrano say Castro-Reyes at times was visibly resisting and actively fighting the officers, whereas Castro-Reyes says he did not actively resist. That dispute is understandable because, at times, the videos do not paint the entire picture and contain ambiguities that are subject to interpretation. These ambiguities are at the heart of the parties' dispute, and it therefore bears repeating that we construe any ambiguities within the body camera videos in Castro-Reyes's favor. *See Baker*, 67 F.4th at 1277-78 (explaining that, at the motion-to-dismiss stage, "courts must construe all ambiguities in the video

footage in favor of the plaintiff"); *Johnson*, 18 F.4th at 1269 ("[W]here the videos do not answer all the questions or resolve all the details of the encounter, we view the evidence in the light most favorable to [the non-moving party] . . . .").

We additionally consider other evidence. Namely, (1) in his deposition, Perez testified that Castro-Reyes never kicked or struck the officers; and (2) family members stated to police at the scene and in depositions that Castro-Reyes was not violent. Further, the body camera videos, construed in favor of Castro-Reyes, do not contradict the family members and would support a jury finding that Castro-Reyes's resistance was de minimis and, at times, non-existent. Indeed, throughout the incident Castro-Reyes was bound at his feet and ankles, and most of the time an officer had a handcuff or firm grasp on Castro-Reyes's right wrist.

### 1.    Officer Serrano

On appeal, Serrano argues that the undisputed facts in the record show his use of force was reasonable considering the circumstances. Serrano points to several cases where this Court stated that "[t]he use of a taser is not categorically unconstitutional." *Charles v. Johnson*, 18 F.4th 686, 701 (11th Cir. 2021). Undoubtedly, the use of a taser *can* constitute a reasonable amount of force, but the cases Serrano relies on are not analogous here. Just the opposite.

For example, in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2008), this Court concluded that the force used was proportionate and reasonable where the police had used a single taser shock

against a "hostile, belligerent, and uncooperative" suspect, not causing any serious injury and leaving the suspect "coherent" and "calmed" shortly after the shock. *Id.* at 1278; *see also Baker*, 67 F.4th at 1281 (single use of taser justified under the totality of the circumstances).

That said, this Court has drawn a distinction between the use of a taser on an uncooperative and combative individual and the use of a taser on a generally cooperative individual. In the 2009 case of *Oliver v. Fiorino*, this Court concluded that while a single taser shock "may have been justified," the defendant officer's repeated use of a taser eight to ten times on a plaintiff who was "largely compliant and cooperative" and was not suspected of committing a crime was "grossly disproportionate to any threat posed and unreasonable under the circumstances." 586 F.3d at 906-07.

This Court reached a similar conclusion in *Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021), where a teenager who was not suspected of a crime, posed no danger to officers, and who was already pinned to the ground by multiple officers was tased three times while the teenager was suffering a grand mal seizure. *Id.* at 1275. In *Helm*, this Court concluded that while no case was exactly on point with the circumstances, the defendant officer was not entitled to qualified immunity because his actions so obviously violated the right that lies at the core of the Fourth Amendment's prohibition on excessive force. *Id.* at 1276.

On the other hand, more force is reasonable when a suspect resists and lunges at the officer. *See Hoyt v. Cooks*, 672 F.3d 972, 979-80 (11th Cir. 2012) (use of taser between five and eighteen times reasonable when plaintiff lunged at officers and "resisted during the entire time" officers attempted to handcuff him).

It is undisputed that Serrano responded to an emergency backup call for help with a violent subject. But the body camera videos show that when Serrano actually arrived, Castro-Reyes was on the wet ground, restrained, and partially undressed. Moreover, the initial responding officers informed Serrano that Castro-Reyes needed psychiatric help or a mental health evaluation. With those facts, a reasonable jury could conclude that (1) Castro-Reyes, in that restrained state, posed no threat to Serrano or any defendant officer; (2) the governmental interest in using a severe level of force was minimal; and (3) any alleged "resistance" by Castro-Reyes to officers' orders to turn over was either de minimis or due to a physical inability to turn over because of Castro-Reyes's restraints, the repeated tasing, the slippery floor, and officers physically manipulating him in an uncoordinated manner.

Body camera video also shows, *inter alia*, that (1) Serrano repeatedly deployed his taser until the battery was drained; (2) the first tasing put Castro-Reyes in the fetal position, thrashing in pain; and (3) Serrano tased Castro-Reyes despite an order from Perez to stop tasing Castro-Reyes. From this, a reasonable jury could conclude that Serrano's use of force was "grossly disproportionate to any threat posed and unreasonable under the circumstances."

*Oliver*, 586 F.3d at 907.  The present record creates genuine issues of material fact as to whether Serrano's actions were unreasonable and therefore constituted excessive force.

At the time of Serrano's conduct in 2020, Castro-Reyes's rights against such unreasonable use of force through a taser were clearly established.  *See Fils v. City of Aventura*, 647 F.3d 1272, 1292 (11th Cir. 2011) (holding it was clearly established that using a taser "is excessive where the suspect is non-violent and has not resisted arrest"); *Oliver*, 586 F.3d at 906-08 (concluding that qualified immunity did not apply to a defendant officer's repeated use of a taser eight to ten times on a plaintiff who was "largely compliant and cooperative" and was not suspected of committing a crime).

In short, viewing the evidence in the light most favorable to Castro-Reyes, a reasonable jury could find that (1) Serrano's interest in using force was minimal considering that Castro-Reyes was bound on the ground when officers arrived; (2) Castro-Reyes never attempted to strike or kick the officers; (3) Castro-Reyes's resistance, if any, was de minimis; and (4) the force employed by Serrano was disproportionally severe and substantial, leaving Castro-Reyes in the fetal position, thrashing in pain.  Thus, the record creates a genuine issue of material fact as to whether Serrano's actions were unreasonable, constituting excessive force. Accordingly, we affirm the district court's decision to deny qualified immunity and summary judgment to Serrano on Castro-Reyes's excessive force claim.

2.    Officer Perez

Castro-Reyes asserts that two separate actions of Perez constituted excessive force.  First, Castro-Reyes claims Perez used excessive force when he employed three closed-fist blows to Castro-Reyes's face while he was restrained by six other officers and not actively resisting.  Second, Castro-Reyes claims Perez used excessive force when he dragged Castro-Reyes outside by his ankles, causing Castro-Reyes's head to hit each of the concrete stairs outside his apartment.

Perez contends that Castro-Reyes (1) failed to comply with officers, (2) engaged in a "prolonged struggle," and (3) appeared to have "superhuman strength."  Perez also contends that his hand was pinned under Castro-Reyes such that his closed-fist punches were necessary to avoid serious injury.

But viewing the evidence in the light most favorable to Castro-Reyes, a reasonable jury could conclude that Castro-Reyes did not pose a threat to officers, and that any resistance was minimal and did not justify the severe quantum of force used.  Specifically, a reasonably jury could conclude that Castro-Reyes: (1) was physically unable to comply with commands due to the slippery floor, restraints, taser shocks, and officers physically manipulating him in an uncoordinated manner; (2) was already fully restrained by six officers surrounding him when Perez employed his closed-fist punches and dragged Castro-Reyes by his ankles outside; and (3) was severely injured by Perez's use of force, as evidenced by Castro-Reyes's dislocated right shoulder, back

pain, lacerations to his face, and the kidney issues associated with his injuries. Bosque's admonition to Perez not to punch Castro-Reyes only bolsters our conclusions.

Since at least 2014, this Circuit has found that officers cannot continue to use gratuitous force on an individual who does not pose a threat to officers' safety, even if that individual previously posed a threat. *Acosta*, 97 F.4th at 1242; *see also Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.") (citing *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000); then citing *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000); and then citing *Lee*, 284 F.3d at 1198). So, if a jury believes Castro-Reyes's account of the record that Perez punched and dragged a bound teenager, who was partially handcuffed, pinned down by multiple other officers, and unable to physically comply because of repeated taser shocks, then Officer Perez is not entitled to qualified immunity under the clearly established law of this Circuit.

As such, the district court did not err when it concluded that material disputes of fact precluded a finding that Officer Perez's use of force was constitutional as a matter of law. Therefore, we affirm the district court's denial of qualified immunity and summary judgment to Perez on Castro-Reyes's excessive force claim.

## V.  CLAIMS UNDER FLORIDA LAW

Officers Serrano and Perez challenge the denial of summary judgment on Castro-Reyes's assault and battery claims under Florida law.  The officers argue that state agent immunity under Florida law shields them from liability.  We are not persuaded.

Under Florida law, a police officer "may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function," except if the officer "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Fla. Stat. § 768.28(9)(a).

Officers Serrano and Perez are thus entitled to state agent immunity from Castro-Reyes's state-law assault and battery claims unless Castro-Reyes demonstrates a genuine dispute of material fact as to whether (1) Serrano and Perez acted with "actual malice," defined as acting with "ill will, hatred, spite, or an evil intent"; (2) Serrano's and Perez's conduct was "worse than gross negligence"; (3) their conduct was "more reprehensible and unacceptable than mere intentional conduct"; or (4) they acted "with a conscious and intentional indifference to consequences and with the knowledge that damage was likely to be done to persons or property."  *Coleman v. Hillsborough Cnty.*, 41 F.4th 1319, 1325, 1329 (11th Cir. 2022) (quoting *Peterson v. Pollack*, 290 So. 3d 102, 109-11 (Fla. Dist. Ct. App. 2020)) (citation modified).

### 1.    Officer Serrano

Taking the record in the light most favorable to Castro-Reyes, a jury could reasonably view (1) Officer Serrano's repeated deployment of the taser, (2) his joking about the tasing with other officers, and (3) his administration of a final shock after Officer Perez ordered him to stop as conduct reflecting a malevolent intent or, at minimum, a willful disregard of Castro-Reyes's safety and rights.  Because these facts, if credited, could satisfy the statutory standard for malice or wanton and willful disregard of Castro-Reyes's safety and rights, we affirm the district court's denial of state agent immunity to Officer Serrano under Florida law.

### 2.    Officer Perez

In a single footnote, Officer Perez argues this Court should reverse the district court's denial of summary judgment as to Castro-Reyes's state-law assault and battery claims because there is insufficient evidence that Perez acted with bad faith, malice, or wanton disregard of Castro-Reyes's safety or rights.

Under our Circuit precedent, an appellant abandons an issue on appeal when he fails to raise and meaningfully develop it in his initial brief.  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.") (collecting cases); *see, e.g., Walter Int'l Prods. Inc. v. Salinas*, 650 F.3d 1402, 1413 n.7 (11th Cir. 2011) (concluding

appellant abandoned claim for tortious interference by making "nothing more than a passing reference" to it in initial brief). Perez did not meaningfully develop his argument on this issue and, thus, likely abandoned it. We nonetheless address the merits of this issue in the interest of judicial economy.

To that end, we conclude that the district court properly denied Officer Perez state agent immunity for Castro-Reyes's state-law assault and battery claims. When the evidence is viewed in the light most favorable to Castro-Reyes, a reasonable jury could conclude that Perez acted with malice or in a manner exhibiting wanton and willful disregard for Castro-Reyes's safety and rights. The record includes evidence that Perez (1) delivered multiple closed-fist strikes and (2) dragged Castro-Reyes down a flight of concrete stairs at a time when Castro-Reyes was already pinned beneath several officers, largely restrained, and being repeatedly tased.

Officer Perez engaged in this level of force despite having little information about why the officers were struggling with Castro-Reyes in the first place. In fact, the initial responding officer admonished Perez for punching Castro-Reyes. Notably, Florida courts have previously found that officers may be found to have acted with malice or wanton disregard when they use significant force without understanding the underlying situation or when the suspect is already restrained. *See Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. Dist. Ct. App. 2003). Under the totality of the

circumstances, a jury could reasonably find malicious purpose or willful disregard of Castro-Reyes's safety and rights.

## VI.  CONCLUSION

For the above reasons, we (1) reverse the district court's denial of qualified immunity to Officers Bosque and Kelly as to the § 1983 false arrest claims; (2) affirm the district court's denial of qualified immunity to Officers Serrano and Perez as to the § 1983 excessive force claims; (3) affirm the district court's denial of state agent immunity to Officers Serrano and Perez as to the Florida assault and battery claims; and (4) remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**